# In the United States Court of Appeals for the Fifth Circuit

### Kimberly Harmon,
*Plaintiff-Appellee,*

*v.*

### Bryan Collier, Executive Director, Texas Department of Criminal Justice; Texas Department of Criminal Justice,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of Texas, Beaumont Division

## BRIEF FOR APPELLANTS

Angela Colmenero
Provisional Attorney General

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Lanora C. Pettit
Principal Deputy Solicitor General

Beth Klusmann
Assistant Solicitor General
Beth.Klusmann@oag.texas.gov

Counsel for Defendants-Appellants

# Certificate of Interested Persons

No. 23-40342

### Kimberly Harmon,

*Plaintiff-Appellee*,

*v.*

### Bryan Collier, Executive Director, Texas Department of Criminal Justice; Texas Department of Criminal Justice,

*Defendants-Appellants.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ Beth Klusmann
Beth Klusmann
*Counsel of Record for*
*Defendants-Appellants*

## Statement Regarding Oral Argument

Defendants seek to reverse a judgment that they engaged in disability discrimination and retaliation when they separated an employee after she exhausted 180 days of leave without pay in a twelve-month period. The issues include extended leave as a reasonable accommodation, sufficiency of the evidence regarding causation, irreconcilable jury answers, and awarding future pension benefits as backpay. Oral argument would be appropriate to ensure that all questions of law and fact may be fully addressed by the parties.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons .................................................................i

Statement Regarding Oral Argument ....................................................ii

Table of Authorities ...............................................................................v

Introduction ...........................................................................................1

Statement of Jurisdiction ......................................................................2

Issues Presented ....................................................................................2

Statement of the Case ...........................................................................3

   I.   Texas Department of Criminal Justice .......................................3

      A.  Duties of correctional officers ............................................3

      B.  Relevant TDCJ policies........................................................5

  II.  Harmon's Employment at TDCJ.................................................6

      A.  Disabilities and leave ..........................................................6

      B.  Initial EEO complaint..........................................................7

      C.  Continuing LWOP ...............................................................9

      D.  Separation from TDCJ.......................................................10

      E.  Post-separation activities................................................. 11

 III.  Procedural History ................................................................. 13

Summary of the Argument.................................................................. 15

Standard of Review ............................................................................. 16

Argument.............................................................................................. 16

   I.   The Jury's Verdict That Harmon's Separation Was Discriminatory and Retaliatory Is Not Supported by the Evidence. ................................................................................ 16

      A.  Harmon was not qualified for the position of correctional officer due to her need for extended leave. ........................18

          1.   Extended or indefinite leave is not a reasonable accommodation. ........................................................ 19

          2.   Providing more than 180 LWOP days per year is not a reasonable accommodation.........................................22

          3.   Harmon's reasonable-accommodation claim also fails. ...............24

B.   There is no evidence that Reyes or anyone else at TDCJ caused Harmon's separation because of discrimination or retaliation. ........................................................................ 27

    1.   Whether Reyes correctly calculated Harmon's LWOP does not prove an unlawful termination. ........................................... 28

    2.   There is no evidence Harmon's separation was the result of discriminatory or retaliatory animus. ......................................... 30

II.   The Jury's Verdict That the Failure to Rehire Harmon Was Discriminatory and Retaliatory Is Not Supported by the Evidence. ................................................................................... 33

III.  The District Court Erred in Entering Judgment on Irreconcilable Jury Findings. ........................................................................... 35

IV.  The District Court's Damages Award Should Be Reversed. ................... 38

   A.   There is no evidence that Harmon would have earned $1 million over four years. ....................................................... 39

   B.   Harmon cannot recover damages against Collier. ............................ 40

   C.   The backpay and attorneys' fees awards should be reversed if this Court alters the judgment. .......................................... 42

Conclusion ..................................................................................... 43

Certificate of Service ......................................................................... 44

Certificate of Compliance ..................................................................... 44

# Table of Authorities

Page(s)

**Cases:**

*In re 3 Star Props., LLC,*
   6 F.4th 595 (5th Cir. 2021) ........................................................ 16, 27

*Barber v. Nabors Drilling U.S.A., Inc.,*
   130 F.3d 702 (5th Cir. 1997) .............................................................. 19

*Barton v. Checkers Drive-In Rests., Inc.,*
   No. 11-186, 2011 WL 1193061 (E.D. La. Mar. 28, 2011) ...................... 26

*Bienkowski v. Am. Airlines, Inc.,*
   851 F.2d 1503 (5th Cir. 1988) ............................................................ 29

*Bd. of Trs. of Univ. of Ala. v. Garrett,*
   531 U.S. 356 (2001) ........................................................................ 40

*Brunner v. Mar. Overseas Corp.,*
   779 F.2d 296 (5th Cir. 1986) .............................................................. 37

*Bryant v. Compass Grp. USA Inc.,*
   413 F.3d 471 (5th Cir. 2005) ................................................. 17, 28, 29

*Byrne v. Avon Prods., Inc.,*
   328 F.3d 379 (7th Cir. 2003) .............................................................. 21

*Carmona v. Sw. Airlines Co.,*
   604 F.3d 848 (5th Cir. 2010) ....................................................... 23, 24

*Carr v. Reno,*
   23 F.3d 525 (D.C. Cir. 1994) .............................................................. 20

*Chamblee v. Miss. Farm Bureau Fed'n,*
   551 F. App'x 757 (5th Cir. 2014) ........................................................ 28

*Clark Cnty. Sch. Dist. v. Breeden,*
   532 U.S. 268 (2001) .................................................................... 31, 34

*Cummings v. Premier Rehab Keller PLLC,*
   142 S. Ct. 1562 (2022) ...................................................................... 14

*Delaval v. PTech Drilling Tubulars, LLC,*
   824 F.3d 476 (5th Cir. 2016) ....................................................... 17, 21

*Echevarria v. AstraZeneca Pharm. LP,*
   856 F.3d 119 (1st Cir. 2017) .............................................................. 21

*Faidley v. United Parcel Serv. of Am., Inc.*,
   889 F.3d 933 (8th Cir. 2018) ............................................................... 23

*Farmer v. Turn Key Installation, LLC*,
   812 F. App'x 200 (5th Cir. 2020) ........................................................ 29

*Farrar v. Hobby*,
   506 U.S. 103 (1992) ................................................................................ 42

*Gantt v. Wilson Sporting Goods Co.*,
   143 F.3d 1042 (6th Cir. 1998) ............................................................. 21

*Goudeau v. Nat'l Oilwell Varco, LP*,
   793 F.3d 470 (5th Cir. 2015) ............................................................... 31

*Griffin v. Matherne*,
   471 F.2d 911 (5th Cir. 1973) ............................................................... 37

*Gross v. FBL Fin. Servs., Inc.*,
   557 U.S. 167 (2009) ................................................................................ 38

*Hedberg v. Ind. Bell Tel. Co.*,
   47 F.3d 928 (7th Cir. 1995) ................................................................. 24

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983) ................................................................................ 42

*Holbrook v. City of Alpharetta*,
   112 F.3d 1522 (11th Cir. 1997) .......................................................... 23

*Hudson v. MCI Telecomms. Corp.*,
   87 F.3d 1167 (10th Cir. 1996) ............................................................. 19

*Hwang v. Kan. State Univ.*,
   753 F.3d 1159 (10th Cir. 2014) ................................................... 19, 22

*January v. City of Huntsville*,
   74 F.4th 646 (5th Cir. 2023) ............................................................... 35

*Johnson v. Ga. Highway Express, Inc.*,
   488 F.2d 714 (5th Cir. 1974) ............................................................... 42

*Knutson v. Schwan's Home Serv., Inc.*,
   711 F.3d 911 (8th Cir. 2013) ............................................................... 20

*Little v. Republic Refining Co.*,
   924 F.2d 93 (5th Cir. 1991) ........................................................ 28, 29

*Manning v. Chevron Chem. Co., LLC*,
   332 F.3d 874 (5th Cir. 2003) ............................................................... 31

*Mathews v. Denver Post*,
   263 F.3d 1164 (10th Cir. 2001) .......................................................... 20

*McGregor v. Nat'l R.R. Passenger Corp.*,
187 F.3d 1113 (9th Cir. 1999) ........................................... 26

*Mercer v. Long Mfg. N.C., Inc.*,
665 F.2d 61 (5th Cir. 1982) ............................................. 36

*Mercer v. Long Mfg. N.C., Inc.*,
671 F.2d 946 (5th Cir. 1982) ........................................... 36

*Miller v. Raytheon Co.*,
716 F.3d 138 (5th Cir. 2013) ........................................... 40

*Milton v. Scrivner, Inc.*,
53 F.3d 1118 (10th Cir. 1995) .......................................... 20

*Moore v. Payless Shoe Source, Inc.*,
187 F.3d 845 (8th Cir. 1999) ........................................... 21

*Moss v. Harris Cnty. Constable Precinct One*,
851 F.3d 413 (5th Cir. 2017) ........................................ 18, 19

*Moss v. Princip*,
913 F.3d 508 (5th Cir. 2019) ........................................ 35, 38

*Mueck v. La Grange Acquisitions, LP*,
75 F.4th 469 (5th Cir. 2023) ........................................... 25

*Nowak v. St. Rita High Sch.*,
142 F.3d 999 (7th Cir. 1998) ........................................... 19

*Owens v. Circassia Pharm., Inc.*,
33 F.4th 814 (5th Cir. 2022) ..................................... 28, 29, 30

*Peyton v. Fred's Stores of Ark., Inc.*,
561 F.3d 900 (8th Cir. 2009) ........................................... 20

*R.B. Co. v. Aetna Ins. Co.*,
299 F.2d 753 (5th Cir. 1962) ........................................... 37

*Reed v. Petroleum Helicopters, Inc.*,
218 F.3d 477 (5th Cir. 2000) ........................................... 19

*Roberson v. Alltel Info. Servs.*,
373 F.3d 647 (5th Cir. 2004) ........................................... 33

*Rogers v. Int'l Marine Terminals, Inc.*,
87 F.3d 755 (5th Cir. 1996) ............................................ 20

*Saketkoo v. Adm'rs of Tulane Educ. Fund*,
31 F.4th 990 (5th Cir. 2022) ........................................... 29

*Samper v. Providence St. Vincent Med. Ctr.*,
675 F.3d 1233 (9th Cir. 2012) .......................................... 20

*Sandstad v. CB Richard Ellis, Inc.*,
309 F.3d 893 (5th Cir. 2002) ........................................................29

*Severson v. Heartland Woodcraft, Inc.*,
872 F.3d 476 (7th Cir. 2017) ................................................ 20, 21, 24

*Skalka v. Fernald Envt'l Restoration Mgmt. Corp.*,
178 F.3d 414 (6th Cir. 1999) ..........................................................40

*Soledad v. U.S. Dep't of Treasury*,
304 F.3d 500 (5th Cir. 2002) .......................................................... 35

*Stallings v. Detroit Pub. Schs.*,
658 F. App'x 221 (6th Cir. 2016) ....................................................22

*Sullivan v. Tex. A&M Univ. Sys.*,
986 F.3d 593 (5th Cir.),
*cert. denied*, 142 S. Ct. 216 (2021) ............................................ 40, 41

*Taylor v. Principal Fin. Grp., Inc.*,
93 F.3d 155 (5th Cir. 1996) ....................................................... 25, 26-27

*Team Contractors, LLC v. Waypoint Nola, LLC*,
976 F.3d 509 (5th Cir. 2020) .................................................... 36, 37

*Tex. State Tchrs. Ass'n v. Garland ISD*,
489 U.S. 782 (1989) ..................................................................... 41

*Turco v. Hoechst Celanese Corp.*,
101 F.3d 1090 (5th Cir. 1996) .........................................................20

*Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*,
31 F.3d 209 (4th Cir. 1994) ........................................................... 21

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
570 U.S. 338 (2013) ......................................................................38

*Vande Zande v. Wis. Dep't of Admin.*,
44 F.3d 538 (7th Cir. 1995) ........................................................... 23

*Waggoner v. City of Garland*,
987 F.2d 1160 (5th Cir. 1993) ....................................................28-29

*Waggoner v. Olin Corp.*,
169 F.3d 481 (7th Cir. 1999) ..........................................................20

*Wantou v. Wal-Mart Stores Tex., LLC*,
23 F.4th 422 (5th Cir. 2022) ...................................................... 3, 16

*Williams v. Manitowoc Cranes, LLC*,
898 F.3d 607 (5th Cir. 2018) ..................................................... 16, 27

*Ex parte Young*,
  209 U.S. 123 (1908) ..........................................................40
*Zamora v. City of Houston*,
  798 F.3d 326 (5th Cir. 2015) ............................................ 33

**Statutes and Rules:**

28 U.S.C.
  § 1291 ............................................................................2
  § 1331 ............................................................................2
29 U.S.C.
  § 794 ..............................................................................2
  § 794(a) .......................................... 17, 18, 27, 30, 35
  § 794(d) ............................................... 17, 18, 27
42 U.S.C.
  § 12102(1)(A) ............................................................. 25
  § 12112 ..........................................................................2
  § 12112(a) ........................................ 17, 18, 27
  § 12112(b)(5)(A) .................................................24-25
  § 12203 ........................................... 2, 17, 27
  § 12203(a) .................................................................. 31
  § 12203(b) .................................................................. 31
  § 2000e-5(k) .............................................................. 41
Fed. R. App. P.
  4(a)(1)(A) ......................................................................2
  4(a)(4)(A) ......................................................................2
  49 ................................................................................ 36
  49(a) ........................................................................... 36
  50(a) ........................................................................... 16
  59 ..................................................................................2

**Other Authorities:**

*Solely*, Merriam-Webster's Collegiate Dictionary (11th ed.)................................. 37

# Introduction

Plaintiff Kimberly Harmon exhausted 180 days of leave without pay (LWOP) in one year and, in accordance with policy, was separated from her employment as a correctional officer with the Texas Department of Criminal Justice. And while Harmon argues that TDCJ was required to accommodate her disabilities with even more leave, she admits that a correctional officer must be present in order to fulfill her job duties. Unable to deny her frequent inability to perform the essential functions of her job, Harmon spent significant time at trial attempting to show that the human resources employee who calculated her LWOP made an error. But she did not show that the employee harbored discriminatory or retaliatory animus. The jury erred in finding otherwise.

The jury's verdict and the district court's judgment reflect additional errors. The jury reached inconsistent conclusions, finding that TDCJ terminated and failed to rehire Harmon *solely* because of her disability—but *also* because of her protected activity. The jury then found that Harmon's four years of backpay amounted to $1 million, even though she testified it was only $227,000. And the district court entered a judgment for damages against a defendant (Bryan Collier) from whom Harmon did not, and could not, seek damages.

The evidence at trial was not sufficient to support the jury's findings and the district court's judgment. The Court should reverse the judgment of the district court and remand with instructions to enter judgment in favor of Defendants.

## Statement of Jurisdiction

Subject-matter jurisdiction exists under 28 U.S.C. § 1331 because Harmon brought claims under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12112, 12203, and the Rehabilitation Act, 29 U.S.C. § 794. ROA.24-26. Appellate jurisdiction exists under 28 U.S.C. § 1291 because this is an appeal from a final judgment. The district court entered its final judgment on March 30, 2023, ROA.785-86, and Defendants timely filed a motion for a new trial and to alter or amend the judgment, ROA.793-830. *See* Fed. R. Civ. P. 59. The district court denied Defendants' motion on May 17, 2023, ROA.2263, and Defendants timely filed their notice of appeal on June 2, 2023, ROA.2264-65. *See* Fed. R. App. P. 4(a)(1)(A), (a)(4)(A).

## Issues Presented

Following a four-day trial, the jury found for Harmon on her claims of disability discrimination and retaliation under the ADA and Rehabilitation Act. ROA.408-12. The district court entered a judgment ordering TDCJ and Collier to pay Harmon $1 million in damages and over $300,000 in attorneys' fees. ROA.785-86. The issues on appeal are:

1. Whether there is sufficient evidence to support the verdict regarding Harmon's termination and reasonable-accommodation claims when (1) Harmon needed 180 days of LWOP in a twelve-month period, and (2) there was no evidence that the employee who calculated Harmon's LWOP harbored discriminatory or retaliatory animus.

2. Whether there is sufficient evidence to support the verdict regarding Harmon's failure-to-rehire claim when there was no evidence regarding any animus of the final decisionmaker.

3. Whether the district court erred in entering a judgment based on the jury's irreconcilable answers that TDCJ's actions were solely caused by disability discrimination but also caused by retaliation.

4. Whether the district court erred in awarding Harmon (1) $1 million for four years of backpay, (2) any amount against Collier, and (3) over $300,000 in attorneys' fees (should the Court reverse any portion of the judgment for Harmon).

## Statement of the Case

## I. Texas Department of Criminal Justice[1]

### A. Duties of correctional officers

TDCJ's number one goal and mission is public safety, ROA.2873, 3035, and to that end it employs over 30,000 individuals, ROA.3305-06. Of significant importance are its correctional officers whose essential job functions include the care and custody of offenders, preventing escapes, maintaining discipline, performing searches, restraining and securing assaultive offenders, responding to emergencies, and, if necessary, using force to control offenders. ROA.4046-47. Accordingly,

---

[1] While Defendants dispute some of these facts and presented contrary evidence at trial, they recognize that the Court must "draw[] all reasonable inferences and resolv[e] all credibility determinations in the light most favorable" to the jury's verdict. *Wantou v. Wal-Mart Stores Tex., LLC*, 23 F.4th 422, 431 (5th Cir. 2022).

correctional officers must be able to walk, kneel, crawl, climb stairs and ladders, lift forty-five pounds, use firearms, and restrain assaultive persons, among other tasks. ROA.4048. And as Harmon agreed, a correctional officer must be present at work in order to perform the essential functions of that job. ROA.2873, 3233.

The Gist Unit, where Harmon worked, is a minimum-security facility that employs approximately 270 correctional officers. ROA.2605-06, 3212. Correctional officers at the Gist Unit work eight-hour shifts, six days on and three days off. ROA.2605-06. First shift is from 6:30 a.m. to 2:30 p.m., and second shift is from 2:30 p.m. to 10:30 p.m. ROA.2546. Third shift is overnight. ROA.2942.

Each shift includes priority-one and priority-two positions. ROA.2948-49. Priority-one positions typically work in the housing areas as well as the control center, a place where officers can watch the area on monitors and receive emergency communications and phone calls. ROA.2949-50, 3209. Priority-one positions are required to be filled for safety reasons. ROA.2949-50, 3209. If there are not enough officers on a shift to fill the priority-one positions, the warden looks for volunteers to fill the slots and, if necessary, "mandator[ies]" enough officers (that is, requires them to work overtime) to ensure that the unit is fully staffed. ROA.3231. To cover for an absent officer, an officer from the earlier shift must stay an extra four hours, and an officer from the later shift must come in four hours early. ROA.3232. Adequate staffing is essential to ensure that inmates can safely get to meals, showers, medical appointments, and recreation. ROA.3034-35, 3230.

### B. Relevant TDCJ policies

**1.** The TDCJ policy most relevant to this lawsuit concerns LWOP. ROA.3612-18. LWOP is available when a condition affecting the employee's mental or physical health prevents her from performing the duties or essential functions of her job. ROA.3612. An employee may use LWOP only after first exhausting all her leave balances, subject to a workers' compensation exception that is not applicable here. ROA.3612. An employee may take only 180 days of LWOP within a rolling twelve-month period. ROA.3612.

LWOP is not an entitlement and requires approval of the warden. ROA.3612. To that end, an employee taking LWOP must provide to TDCJ a healthcare-provider statement as well as a leave request. ROA.3614 (referring to an "HCPS" and "PERS 24"). When calculating LWOP days, TDCJ includes the employee's regularly scheduled calendar days off if they fall in between the first day of LWOP and her return to work. ROA.3613. But an employee who reports for her shift for a minimum of eight minutes is not required to use LWOP for that day. ROA.3613. Further, if the employee exhausts her 180 days during her calendared days off, but she is released to work at that time, she may return to work for her next scheduled day on shift. ROA.3613.

An employee is separated from employment with TDCJ upon exhausting 180 days of LWOP in a twelve-month period. ROA.3615. No witness in this case, including Harmon, was aware of any TDCJ employee who was given additional time off after exhausting 180 days of LWOP. ROA.2632, 2988, 3219. Instead, TDCJ's human resources processes 35 to 40 LWOP exhaustions per month. ROA.3305.

**2.**   The other workplace policy discussed at trial concerned returning to work with or without restrictions. A correctional officer must be able to perform all the duties of the job, so she may not return to work as a correctional officer with medical restrictions. ROA.3242. Per TDCJ policy, if a doctor releases an employee to work with limitations or restrictions, human resources is to notify the warden. ROA.3619. Warden Charles Siringi explained that if an employee requested an accommodation from him, he would consider whether it would interfere with the performance of her duties or the safety of the facility. ROA.3228. If the doctor or employee identifies the restriction as permanent, then human resources is to inform the employee that job-placement assistance is available. ROA.3619-20. Human resources will work with the employee to identify other potential positions within TDCJ that the employee could fill, given the employee's restrictions. ROA.3290-91; *see also* ROA.2956-57.

## II.   Harmon's Employment at TDCJ

Plaintiff Kimberly Harmon began working for TDCJ as a correctional officer in 1998. ROA.2542-43. She voluntarily left in 2008 but was rehired in 2009 to work at TDCJ's Gist Unit. ROA.2543-44. During the period relevant to this lawsuit, Siringi was the warden of the Gist Unit. ROA.3208. He reported to John Werner, who was the Region III director. ROA.2923-24.

### A.   Disabilities and leave

When she was rehired by TDCJ in 2009, Harmon suffered from hypertension and diabetes. ROA.2544. Harmon testified that TDCJ was aware of her hypertension prior to rehiring her and that she made TDCJ aware of her diabetes after she was

rehired. ROA.2544. In addition to those conditions, Harmon also suffered from low back pain following a car accident in 2016. ROA.2544-45. According to Harmon, these conditions manifested as dizziness, light-headedness, migraines, back pain, the inability to walk, and even the inability to get up. ROA.2561.

As shown by the evidence, during this second period of employment, Harmon had a significant number of absences due to those conditions and others. The record includes over 40 separate leave requests from Harmon from 2015 until her separation from TDCJ in May 2018, ROA.4063-107, all of which were approved, ROA.2641 (admitting she had never been denied LWOP in the past). There are also over 70 pages of doctor's notes submitted by Harmon since 2015 to support her requests for leave, ranging from the conditions related to her disabilities to more temporary medical issues. ROA.4108-79; *see also* ROA.4119 (menstrual cramps), 4126 (ear issues, gas pain, cough), 4136 (abdominal pain), 4138 (post-nasal drainage), 4146 (tooth pain). Harmon's LWOP is also reflected in her time records, ROA.3569-80, in which "RW77:77" indicates days of LWOP used, ROA.3084.

## B. Initial EEO complaint

In 2017, Harmon was working the first shift, having previously been on a waitlist to be placed on that shift. ROA.2545-46. While she was on LWOP in August, Siringi assigned her to second shift, a shift that she found less desirable. ROA.2546-47; *see also* ROA.4097 (request for LWOP from August 21 to September 21). Siringi testified that he changed her shift to better absorb her absences, as second shift had more people assigned to it. ROA.3210, 3212-22. Harmon was informed of this change by a phone call from human resources. ROA.2547, 2615.

Harmon wrote an interoffice communication to complain about the change and asked to be placed back on first shift, as she felt she could better manage her medications with those hours. ROA.2549, 3700. Harmon also claims she left messages with Siringi's secretary but never received a call back. ROA.2548. On September 1, while still on leave, Harmon called human resources and was told that she was on first shift. ROA.2551.

Because her doctor required her to be out until September 22, ROA.3910, Harmon did not return to work until September 25, when she arrived for first shift, ROA.2551-52. At that point, she was pulled aside by a supervisor and informed that she was on second shift. ROA.2552. Harmon contends this raised her blood pressure, causing her to return to her doctor, ROA.2555, who wrote another note indicating that, because of Harmon's low back pain and glucose levels dating back to September 22, she was unable to work until October 2, ROA.3909.

Harmon then filed grievances alleging that the shift change was discriminatory, retaliatory, and in violation of the Family and Medical Leave Act. ROA.2556-57, 3920-47.[2] As explained by Werner, TDCJ routes grievances (general complaints) to the warden and complaints about discrimination to TDCJ's EEO office. ROA.3020-22. Here, Harmon's complaint about the shift change was routed through the grievance process, while her complaint of discrimination was sent through TDCJ's EEO office. ROA.3022-26, 3965-68.

---

[2] Harmon has since understood that she was not on FMLA leave at that time. ROA.2615.

The EEO complaint was eventually referred to Werner who concluded that (1) an investigation did not reveal that Harmon had been singled out due to her medical condition, but (2) the "situation could have been handled in a better manner." ROA.3951. Harmon was therefore moved back to first shift. ROA.3951. Harmon claims that when she returned to work, Siringi yelled in her direction "How you going to say I violated the leave law?" ROA.2560. Siringi denies this. ROA.3225.

As a result of Harmon's EEO complaint, human resources mailed Harmon an ADA accommodation packet, ROA.3866, which asks about an employee's abilities and limitations in order to assist TDCJ in finding an accommodation, ROA.4053-62. Another human resources witness testified that she physically handed Harmon an ADA accommodation packet around the same time. ROA.3259-62. But Harmon asserts that she never received an accommodation packet. ROA.2622-23.

## C. Continuing LWOP

In the year before her separation from TDCJ, Harmon continued to take LWOP and other leave, pursuant to her doctor's instructions, for her hypertension, diabetes, and low back pain. ROA.2561-62. Upon notice that an employee is using LWOP, TDCJ's human resources is to complete and print a "PERS 301" (a notification of medical and family leave) and mail it to the employee. ROA.3077, 3616, 3621. Among other items, this notice informs the employee of when her LWOP period began and how many LWOP days she has left. ROA.3621. This documentation shows that the number of LWOP days that Harmon had available was steadily decreasing. ROA.4199-215. For example, Harmon had 78 days of LWOP remaining in May 2017, 41 days in December 2017, and 22 days in January 2018. ROA.4199, 4208, 4210.

The form for March 2018, however, stated that Harmon had 80 days of LWOP remaining. ROA.2564, 3652. Marisol Reyes, the TDCJ human resources employee who prepared the form, testified that the statement that Harmon had 80 days of LWOP remaining in March was an error—one she did not realize she had made until trial. ROA.3080. Harmon did not claim that she relied on that form in requesting additional LWOP, however, but insisted that her doctor determined whether she could work or not. ROA.2561-62, 2909.

## D. Separation from TDCJ

Harmon began taking leave again on May 8, 2018, and was placed on LWOP effective May 11. ROA.4214. Reyes prepared the paperwork that advised Harmon that as of the date of the notice (May 14), Harmon had only 16 days of LWOP left. ROA.4214. Consequently, Harmon would exhaust her LWOP on May 30—16 days from May 14. Harmon asserted that she never received this paperwork. ROA.2565.

The record reflects that Harmon submitted a doctor's note dated May 14 indicating that she could return to work on May 16, ROA.4175, a note from a dentist dated May 16 indicating that she could return to work on May 21, ROA.4176, and a note dated May 24 indicating that she could return to work on May 26, ROA.4177. On Wednesday, May 30, when Harmon had not returned, ROA.3091, Reyes called Harmon around 4:30 p.m. and left her a voicemail informing her that her LWOP days were exhausted and that if she did not return to work on May 31, she would be separated from TDCJ. ROA.2565. Harmon testified that she did not receive the voicemail until Saturday (June 2) because her cell phone was broken and cracked. ROA.2565, 2869.

Harmon went to the doctor on May 31, ROA.2568, the day after her LWOP was exhausted. Her doctor wrote a note stating that Harmon could return to work on June 4 without restrictions, indicating a diagnosis of migraines, leg scar pain, and lower back pain that dated back to May 26. ROA.3874. Because of Harmon's calendared days off, June 4 was her next scheduled workday after May 31. ROA.2871. The note was faxed to TDCJ after 5:00 p.m., and Reyes received it on June 1. ROA.3148. Reyes left Harmon another voicemail on June 1 advising her not to return to work until Huntsville (where TDCJ's human resources was headquartered) had concurred. ROA.2566; *see also* ROA.3012.

Reyes did not forward the May 31 doctor's note to anyone considering Harmon's separation. ROA.3103. Reyes prepared the separation paperwork on June 1, and Brandi Doshier in Huntsville concurred with it on June 2. ROA.3095, 3961-62. On June 5, Reyes prepared the payroll-status-change paperwork, ROA.3960, and sent Harmon a notification that she had been separated due to exhaustion of LWOP, ROA.3959. Siringi approved the payroll-status change several days later. ROA.3960 (June 8). Harmon testified that she believes she would still be working for TDCJ if she had not exhausted her LWOP. ROA.2643.

### E. Post-separation activities

**1.** After her separation from TDCJ, Harmon testified that she looked for jobs and found a few short-term options. ROA.2576. Then she decided to reapply with TDCJ in November 2019. ROA.2577-78. Harmon indicated in her application that she wanted to work at the Gist Unit. ROA.3678, 3683. She later called to express her interest in other units and was told by human resources that the notation on her

application would not matter. ROA.2587. Harmon asserts that she never heard back from TDCJ regarding her application. ROA.2581.

TDCJ records show that Harmon received one recommendation for rehire and that, in January 2020, Werner recommended that she not be rehired. ROA.3673. The decision not to rehire was then made by Billy Hirsch. ROA.3673. Harmon asserts she never received the letter informing her that TDCJ would not be offering her employment until it was produced in litigation. ROA.2584, 3685.

Werner testified that he did not remember why he recommended not rehiring Harmon. ROA.3013, 3032. Werner also noted that he reviews anywhere from 10 to 50 rehire applications per day. ROA.3028. Upon questioning by Harmon's counsel, Werner agreed that it could have been that Harmon applied to work at the Gist Unit, which at times had adequate staffing levels. ROA.3013.

Since then, Harmon has concluded that she has a mental block to working for TDCJ and is not requesting reinstatement. ROA.2913. It does not appear that Harmon has obtained work since her reapplication with TDCJ. *See* ROA.4232-54 (pay stubs through June 2019).

**2.** At the time of her separation, Harmon was making $3880 a month as a correctional officer. ROA.2593. Harmon estimated that her lost wages and benefits at the time of trial amounted to $227,000. ROA.2595. Harmon also described the retirement and annuity she would have received had she remained employed with TDCJ through 2029. ROA.2596-97, introducing into evidence the Employees Retirement System of Texas (ERS) projection of her retirement benefits, ROA.3566. Based on the ERS statement, Harmon testified she would have received $861,000 in

annuity payments had she remained employed with TDCJ until she retired. ROA.2597. But as Harmon admitted, that amount was "a projection over the lifetime once I retire." ROA.2884.

### III. Procedural History

Harmon filed a charge of discrimination with the EEOC in July 2018 and received a decision in May 2020. ROA.2589, 3561-62. The EEOC concluded that there was reasonable cause to believe that Harmon had been denied a reasonable accommodation and terminated because of discrimination regarding her disability and retaliation for engaging in a protected activity. ROA.3561-62.

Harmon filed suit in November 2020, bringing claims under the ADA and the Rehabilitation Act. ROA.17-27. First, Harmon sued Bryan Collier, in his official capacity as executive director of TDCJ, for discrimination and retaliation in violation of the ADA. ROA.24-25. She sought only prospective injunctive relief from Collier, including reinstatement. ROA.25. Second, Harmon sued TDCJ for discrimination and retaliation in violation of the Rehabilitation Act. ROA.25-26. She sought backpay, lost benefits, seniority, and compensatory damages. ROA.25.

There was a four-day trial, during which Defendants moved for judgment as a matter of law after Harmon presented her case, ROA.3154-203, and both parties moved for judgment after the close of evidence, ROA.3378-92. The district court denied those requests. ROA.3203, 3393. Afterwards, the jury answered every question in Harmon's favor. ROA.408-12. With respect to TDCJ, the jury found that TDCJ terminated Harmon (1) solely because of her disability, (2) solely because of her record of having diabetes, hypertension, and low back pain, and/or (3) solely

because she was regarded as having diabetes, hypertension, and low back pain. ROA.408, 410. But the jury also found that TDCJ would not have terminated Harmon but for her requests for reasonable accommodations and complaints related to her disability. ROA.409. Similarly, the jury found that TDCJ failed to rehire Harmon solely because of her disability, ROA.408, but also that TDCJ would have rehired her but for her EEOC charge of discrimination, requests for reasonable accommodations, and complaints related to her disability, ROA.409. The jury also found that TDCJ failed to reasonably accommodate Harmon. ROA.409. The jury awarded $800,000 in compensatory damages and $1 million in wages and benefits from May 31, 2018, to April 7, 2022. ROA.410.

With respect to Collier, whose name came up only once in testimony, ROA.3316, the jury found that he terminated or failed to rehire Harmon because of her disability, terminated and failed to rehire her because of retaliation, and failed to reasonably accommodate her disability, ROA.410-12.

Following post-trial motions, briefing, and argument, the district court declined to award compensatory damages because the Supreme Court had decided such damages were not available under the Rehabilitation Act. ROA.769-71 (citing *Cummings v. Premier Rehab Keller PLLC*, 142 S. Ct. 1562, 1567 (2022)). The court also denied Harmon's request for front pay, concluding that her complaint did not include a request for front pay under the Rehabilitation Act. ROA.778.

The court then entered judgment for Harmon, awarding her (1) $1 million in damages for wages and benefits against both TDCJ and Collier, and (2) over $300,000 in attorneys' fees against both TDCJ and Collier. ROA.785-86.

Defendants filed a motion for new trial or, in the alternative, to alter or amend the judgment. ROA.793-830. The court denied the motion, ROA.2263, and Defendants appealed, ROA.2264-65.

## Summary of the Argument

Neither the ADA nor the Rehabilitation Act guarantees employment to an individual who cannot perform the essential functions of her job even with a reasonable accommodation. And neither statute is a means to review whether an employer's decision that an employee violated policy was the correct decision. But that is how those statutes were used here.

Harmon needed more than 180 days of LWOP within the twelve-month period before her separation from TDCJ. Such an accommodation is not reasonable because it does not enable Harmon to perform her job but excuses her nonperformance, eliminates the essential function of attendance, and places additional burdens on her employer and coworkers. And Harmon's focus on whether Reyes properly calculated her LWOP obscured the fact that Harmon had no evidence that Reyes (or anyone else) caused her termination because of disability discrimination or retaliation. The jury's verdict on the termination claims cannot stand.

Neither can the jury's verdict on the failure-to-rehire claim, given that Harmon has no evidence of animus on the part of the final decisionmaker. But even if the Court believes the evidence sufficient on her termination and retaliation claims, a new trial is warranted because the jury's answers to the questions are irreconcilable—TDCJ could not have taken adverse action against Harmon solely because of her disability but also because of her protected activities. The district court's

judgment contains additional errors—awarding $1 million for four years of backpay based on Harmon's future pension benefits, and awarding damages against Collier when Harmon did not seek any from him. For all these reasons and the others discussed within, the Court should reverse the judgment below and remand with instructions that the district court enter judgment in favor of Defendants.

## STANDARD OF REVIEW

This Court reviews the denial of a motion for judgment as a matter of law de novo, applying the same legal standard as the trial court. *Wantou*, 23 F.4th at 431; Fed. R. Civ. P. 50(a). The Court will reverse the denial if the jury's factual findings are unsupported by substantial evidence or "the legal conclusions implied from the jury's verdict cannot in law be supported by those findings." *Williams v. Manitowoc Cranes, LLC*, 898 F.3d 607, 614 (5th Cir. 2018) (citation omitted). The Court considers all the evidence and draws all reasonable inferences and resolves all credibility determinations in the light most favorable to the non-moving party. *Id.*

This Court reviews the denial of a motion for new trial for abuse of discretion. *In re 3 Star Props., LLC*, 6 F.4th 595, 608 (5th Cir. 2021). It will reverse the denial "only when there is an absolute absence of evidence to support the jury's verdict." *Id.* at 613 (quoting *Williams*, 898 F.3d at 614).

## ARGUMENT

### I. The Jury's Verdict That Harmon's Separation Was Discriminatory and Retaliatory Is Not Supported by the Evidence.

Harmon was separated from TDCJ because she exhausted 180 days of LWOP within a twelve-month period. ROA.3959. Even Harmon believes she would have

still been employed but for that exhaustion. ROA.2643. The jury made two fundamental errors in finding otherwise. ROA.408-12 (jury questions 1(a), 2(a), 3, and 5 related to TDCJ, and questions 1-3 and 5 related to Collier).

First, the jury erred in concluding that Harmon was a qualified individual with a disability as required by both the Rehabilitation Act and ADA. 29 U.S.C. § 794(a); 42 U.S.C. § 12112(a). While on LWOP, Harmon was unable to perform the essential functions of a correctional officer. ROA.2873. And while a requested accommodation of leave can be reasonable in some circumstances, extended or indefinite leave is not. *Delaval v. PTech Drilling Tubulars, LLC*, 824 F.3d 476, 481 (5th Cir. 2016). As a matter of law, Harmon's inability to be present at work for 180 days of a twelve-month period renders her unqualified and her requested accommodation unreasonable.

Second, the jury erred in concluding that Harmon demonstrated her termination was caused (either solely or because of) disability discrimination or retaliation. 29 U.S.C. § 794(a), (d); 42 U.S.C. §§ 12112(a), 12203. Much of the trial testimony focused on whether Reyes properly concluded that Harmon exhausted her LWOP. But an alleged error in counting does not prove discriminatory or retaliatory animus. *See Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (evidence that an employer's investigation came to the wrong conclusion does not demonstrate discriminatory animus). Because Reyes made the 180-day determination and was the only employee aware of Harmon's request to remain off work until June 4, her motivations are the ones that matter. And there simply is no evidence that she (or anyone else for that matter) desired to discriminate or retaliate against Harmon.

## A. Harmon was not qualified for the position of correctional officer due to her need for extended leave.

The Rehabilitation Act protects a "qualified individual with a disability" from being subjected to discrimination solely because of that disability with respect to programs receiving federal financial assistance. 29 U.S.C. § 794(a). Similarly, the ADA protects a "qualified individual" from disability discrimination in the workplace. 42 U.S.C. § 12112(a). Harmon must therefore establish that she is "qualified" by showing that either (1) she could perform the essential functions of her job despite her disabilities, or (2) a reasonable accommodation would have enabled her to perform the essential functions of her job. *Moss v. Harris Cnty. Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017).[3]

Harmon admits that she could not perform the essential functions of her job if she was not at work. ROA.2873. But she asserts that, had she been accommodated with leave, she could have performed the essential functions when she was able to work. ROA.2872-74. So the question whether Harmon was qualified for the position of correctional officer is answered by whether her request for more than 180 days of LWOP in a twelve-month period was a reasonable accommodation. It was not. Harmon was, therefore, not qualified for the position of correctional officer when she was separated from her employment with TDCJ and cannot maintain her Rehabilitation Act and ADA claims.

---

[3] Because the Rehabilitation Act incorporates the standards of the ADA, 29 U.S.C. § 794(d), cases regarding either statute are relevant.

### 1. Extended or indefinite leave is not a reasonable accommodation.

The district court erred in entering judgment on the jury's verdict because providing Harmon with more than 180 days of LWOP is not a reasonable accommodation. This Court, as well as numerous other circuits, has held that extended or indefinite leave is not a reasonable accommodation required by federal anti-discrimination law. *Moss*, 851 F.3d at 418; *Reed v. Petroleum Helicopters, Inc.*, 218 F.3d 477, 481 (5th Cir. 2000) (per curiam); *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1004 (7th Cir. 1998); *Hudson v. MCI Telecomms. Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996). The reasons for this are several: reasonable accommodations should enable an employee to work, attendance is typically an essential function of a job, and accommodations are not reasonable when they require other employees to work longer and harder.

**a.** *First*, as then Judge-Gorsuch wrote for the Tenth Circuit, reasonable accommodations "are all about enabling employees to work, not to not work." *Hwang v. Kan. State Univ.*, 753 F.3d 1159, 1161-62 (10th Cir. 2014). This Court has similarly noted that it "cannot say that [the plaintiff] can perform the essential functions of the job with reasonable accommodation, if the only successful accommodation is for [the plaintiff] *not* to perform those essential functions." *Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702, 709 (5th Cir. 1997) (emphasis added). Accordingly, "an employer is not required to accommodate a disabled worker by . . . eliminating an essential function of the job." *Mathews v. Denver Post*, 263 F.3d 1164, 1168-69 (10th Cir. 2001). As a result, "[i]f the proposed accommodation does not make it possible for the employee to perform his job, then the employee is not a 'qualified individual'

as that term is defined in the ADA." *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017); *see also Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 903 (8th Cir. 2009) ("[I]it is axiomatic that a person who cannot perform any of the functions of a job, with or without reasonable accommodation, cannot, as a matter of law, be considered 'otherwise qualified' under the ADA.").

*Second*, this Court has also framed the issue as whether attendance is an essential function of the job, holding that "[a]n essential element of any . . . job is an ability to appear for work . . . and to complete assigned tasks within a reasonable period of time." *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996) (quoting *Carr v. Reno*, 23 F.3d 525, 530 (D.C. Cir. 1994)). Multiple other circuits have also adopted this approach. *See, e.g.*, *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237-38 (9th Cir. 2012) (collecting cases); *Waggoner v. Olin Corp.*, 169 F.3d 481, 482 (7th Cir. 1999) ("The rather common-sense idea is that if one is not able to be at work, one cannot be a qualified individual.").

*Third*, providing extended leave also places burdens on other employees who must cover for the absent individual. But "an accommodation that would result in other employees having to work harder or longer is not required under the ADA." *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996) (per curiam) (regarding request for day shift, rather than standard rotating shift); *see also Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 916 (8th Cir. 2013) (noting that an accommodation is unreasonable if it requires an employer to "reassign existing workers to assist [the employee] in his essential duties" (alteration in original) (citation omitted)); *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir. 1995) ("An

accommodation that would result in other employees having to work[] harder or longer hours is not required.").

**b.**    TDCJ does not deny that leave can be an appropriate and legally required accommodation. As this Court has held, "[t]ime off, whether paid or unpaid, can be a reasonable accommodation." *Delaval*, 824 F.3d at 481. But "an employer is not required to provide a disabled employee with indefinite leave," *id.*, because "an extended leave of absence does not give a disabled individual the means to work; it excuses his not working," *Severson*, 872 F.3d at 481; *see also Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119, 130 (1st Cir. 2017) (collecting cases). Or, as the Eighth Circuit has stated, "[a]n employee who is unable to come to work on a regular basis [is] unable to satisfy any of the functions of the job in question, much less the essential ones." *Moore v. Payless Shoe Source, Inc.*, 187 F.3d 845, 848 (8th Cir. 1999) (internal quotations omitted) (second alteration in original). The Fourth and Sixth Circuits have ruled similarly. *See Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) ("An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA."); *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 212-14 (4th Cir. 1994) (same).

Consequently, the "[i]nability to work for a multi-month period removes a person from the class protected by the ADA." *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003) (two months of leave). Regarding a need for six months of leave, then-Judge Gorsuch wrote that "an employee who isn't capable of working for so long isn't an employee capable of performing a job's essential functions—and [] requiring an employer to keep a job open for so long doesn't qualify as a reasonable

accommodation." *Hwang*, 753 F.3d at 1161-62 (six months of leave); *see also Stallings v. Detroit Pub. Schs.*, 658 F. App'x 221, 226-27 (6th Cir. 2016) (four months of leave).

### 2. Providing more than 180 LWOP days per year is not a reasonable accommodation.

There is no question that being at work is an essential function of a correctional officer. ROA.2873, 3233. One cannot prevent escapes, maintain discipline, perform searches, restrain and secure assaultive offenders, and respond to emergencies while not at work. ROA.4046-47. And even Harmon admitted that, to fulfill her job responsibilities, she needed to be at the Gist Unit. ROA.2873. Further, every time Harmon's absence created a deficit of priority-one officers, two additional officers would have to work overtime to cover her shift. ROA.3231-32. Thus, extending LWOP past 180 days would not enable her to perform the essential functions of her job as a correctional officer, would eliminate the essential function of attendance, and would place additional burdens on other employees. Under the precedent just described, Harmon's need for extended, and likely indefinite, leave is unreasonable. It makes no difference that Harmon's 180 days of LWOP came through multiple requests for smaller amounts of leave over time, rather than all at once. An indefinite number of leave requests results in indefinite leave.

Harmon claims she needed only "one more day" of LWOP, ROA.2641, but the reality is that she needed 180 days of LWOP in the prior twelve months. *See, e.g.*, ROA.4093-107 (LWOP requests from May 2017 through March 2018). And she would likely need more in the future: Harmon admits that her disabilities were not

going away. She still has diabetes and hypertension, ROA.2893, and she agreed she would probably need more time off as a result, ROA.2902.

That TDCJ has already provided Harmon 180 days of LWOP does not mean it is required to provide even more days off. Multiple circuits have held that an employer's decision to voluntarily offer an accommodation that might not otherwise be required under anti-discrimination statutes does not bind the employer to continue offering that accommodation. *See, e.g.*, *Faidley v. United Parcel Serv. of Am., Inc.*, 889 F.3d 933, 943 (8th Cir. 2018) (en banc) ("If an employer 'bends over backwards to accommodate a disabled worker . . . it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.'" (citation omitted)); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1528 (11th Cir. 1997); *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995). To hold otherwise would incentivize employers to cut ties with employees sooner, lest the employer be bound to unreasonably accommodate that employee indefinitely by its prior generous actions.

The sole case Harmon relied on below is not to the contrary. ROA.2240 (citing *Carmona v. Sw. Airlines Co.*, 604 F.3d 848 (5th Cir. 2010)). In *Carmona*, Southwest Airlines terminated an employee with a disability after he accumulated too many absences under its policy. *Id.* at 852-53. When Southwest Airlines argued that the employee was not qualified because he could not meet the attendance requirements, the plaintiff pointed to other employees who had also failed to meet the attendance requirements but were not terminated. *Id.* at 860-61. Thus, the attendance requirements were not enforced equally, leading to an inference of discrimination. *Id.* at 861.

Here, TDCJ's policy is enforced across the board, unlike the policy in *Carmona*. Although TDCJ's human resources processes 35 to 40 LWOP exhaustions per month, ROA.3305, no witness was aware of any TDCJ employee who received additional LWOP beyond the 180 days specified in TDCJ policy, ROA.2632, 2988, 3219. Thus, the inference of discrimination present in *Carmona* is not present here.

Federal anti-disability discrimination statutes are "not a job insurance policy, but rather a congressional scheme for correcting illegitimate inequities the disabled face." *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995). Holding that an employer must allow indefinite medical leave would transform the Rehabilitation Act and ADA into "medical-leave statute[s]—in effect, an open-ended extension of the FMLA." *Severson*, 872 F.3d at 482. Harmon's request for over 180 days of LWOP in a twelve-month period is not a reasonable accommodation. Accordingly, she was not qualified for the position of correctional officer at the time of her separation from TDCJ, and her termination claims must fail.

### 3. Harmon's reasonable-accommodation claim also fails.

Harmon's reasonable-accommodation claim is wrapped up in her termination claim—the only accommodation she requested was an additional LWOP day in order to avoid separation under TDCJ's policy. But as just demonstrated, allowing her additional days off was not a reasonable accommodation. *See supra* pp. 18-24. Thus, the jury's verdict regarding her reasonable-accommodation claim cannot stand.

**a.** Harmon's reasonable-accommodation claim fails for an additional reason: her doctor's note was not a request for a reasonable accommodation. Employers are required to reasonably accommodate an employee's disability, 42 U.S.C.

§ 12112(b)(5)(A), and a disability is a "physical or mental impairment that substantially limits one or more major life activities" of an individual, *id.* § 12102(1)(A). Absent an open or obvious condition, the burden rests on the employee to "specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996). This burden is not met by showing only that TDCJ *might* have found that Harmon *might* have needed an accommodation: the initial burden of identifying a need for an accommodation always remains with the employee. *Mueck v. La Grange Acquisitions, LP*, 75 F.4th 469, 488 (5th Cir. 2023).

Harmon's doctors' notes for May 2018 included diagnoses of hypertension, abdominal pain, leg pain, and back pain from "lift[ing] a case of water," as well as an apparent dental procedure. ROA.4175-78. And her May 31 doctor's note permitting her to return to work, which was faxed in after hours when Harmon had already exhausted her LWOP days, listed migraines, leg pain, and back pain, ROA.3874—all of which can be experienced by individuals without a disability. Intermittent requests for leave, some of which could relate to a disability and some of which likely do not, would not have demonstrated to TDCJ that Harmon was requesting the accommodation of extending her LWOP past TDCJ's 180-day limit due to a disability.

**b.**  Harmon also asserts that TDCJ's policy regarding returning to work as a correctional officer without restrictions is per se a violation of the ADA. ROA.2246 n.2. Harmon misconstrues TDCJ's policy as a "100% healed" policy. ROA.2246 n.2. TDCJ does not require an employee to be 100% healthy—indeed, Harmon performed her duties for years while suffering from hypertension, diabetes, and low back

pain. And TDCJ provided her all the leave she requested, until she had exhausted it. ROA.2641 (admitting she had never been denied LWOP in the past). Instead, a correctional officer must be able to perform the duties of a correctional officer without restrictions in order to work as a correctional officer. ROA.3242.

The position of correctional officer is unlike those at issue in Harmon's precedent, which concerned the assistant manager at a restaurant who was unable to lift 50 pounds, *Barton v. Checkers Drive-In Rests., Inc.*, No. 11-186, 2011 WL 1193061, at *1 (E.D. La. Mar. 28, 2011), and a ticket agent at a train station who was unable to lift 20 pounds, *McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1114 (9th Cir. 1999). Correctional officers must be able to prevent escapes, maintain discipline, perform searches, restrain and secure assaultive offenders, respond to emergencies, and, if necessary, use force to control offenders. ROA.4046-47. Harmon has never identified what accommodations (other than leave) would have enabled her to perform these essential functions while suffering from dizziness, light-headedness, and the inability to walk or get up. ROA.2561.

And TDCJ provided options for those who needed accommodations. Siringi testified that, were an employee to ask him about potential accommodations, he would consider on a case-by-case basis whether the accommodation would interfere with the performance of their duties or the safety of the facility. ROA.3228. An officer with permanent restrictions is able to use TDCJ's job-assistance resources to find a different position within TDCJ that would accommodate her limitations. ROA.2956-57, 3290-91. If Harmon believed she needed an accommodation to TDCJ's policy on working without restrictions, she had an obligation to suggest one. *Taylor*, 93 F.3d at

165. She never did so. Instead, her entire case is bound up in her request for additional leave—because her doctor determined when she could work, ROA.2561-62, 2909—not a desire to return to work in some reduced capacity. Absent an accommodation other than her request for an unreasonable amount of LWOP, Harmon has no evidence she was harmed by TDCJ's policy.

## B. There is no evidence that Reyes or anyone else at TDCJ caused Harmon's separation because of discrimination or retaliation.

Even if Harmon were a qualified individual with a disability, the jury's decision that she was separated because of disability discrimination or retaliation is not supported by substantial evidence. *See Williams*, 898 F.3d at 614. Indeed, there is an "absolute absence of evidence" to support the verdict. *See In re 3 Star Props.*, 6 F.4th at 608.

Regardless of whether the standard is sole cause, 29 U.S.C. § 794(a), or but-for cause, *id.* § 794(d); 42 U.S.C. §§ 12112(a), 12203, Harmon's evidence does not meet it. Harmon's evidence of an unlawful termination was primarily that Reyes miscalculated her LWOP days. But as this Court has held, "[e]ven when an employee presents evidence that would allow a jury to conclude that an employer's proffered justification for an adverse action is false, that does not necessarily permit a rational inference that the real reason was discrimination." *Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 835 (5th Cir. 2022). Instead, "[m]otive is the issue." *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991).

And there is no evidence of motive here. Harmon's separation originated with Reyes, ROA.3959-62, and Harmon offered no reason to believe that Reyes desired

to discriminate against or retaliate against her. And there is no evidence that anyone who subsequently concurred in the separation knew of (1) any potential error in the LWOP calculation, and (2) Harmon's late doctor's note. Instead, as even Harmon acknowledged, she would still be working for TDCJ if she had not exhausted her LWOP. ROA.2643. Without evidence of a discriminatory or retaliatory motive, a mere counting error is not enough to prove Harmon's termination was unlawful.

### 1. Whether Reyes correctly calculated Harmon's LWOP does not prove an unlawful termination.

Much of trial was spent determining whether Reyes correctly calculated when Harmon would exhaust her LWOP: Reyes calculated it would expire on May 30, ROA.4214; another TDCJ witness set the date at May 29, ROA.3328; and Harmon's counsel suggested it was May 27, ROA.3090. Harmon also focused on the erroneous notice from March 2018 that indicated she had another 80 days of LWOP available. ROA.3652; *see also* ROA.3080 (Reyes acknowledging the March statement was an error).

But whether Reyes got it right is not the correct question because "[m]anagement does not have to make proper decisions, only non-discriminatory ones." *Bryant*, 413 F.3d at 478 (citing *Little*, 924 F.2d at 97). Thus, the Court's analysis of whether "an alleged violation of an employer's policy is a pretext for discrimination does not turn on whether the employee in fact violated the policy, but rather whether the employer reasonably believed the employee violated the policy and acted based on that belief." *Chamblee v. Miss. Farm Bureau Fed'n*, 551 F. App'x 757, 760 (5th Cir. 2014) (per curiam) (citing *Waggoner v. City of Garland*, 987 F.2d 1160, 1165 (5th Cir.

1993)). Employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of business decisions, nor . . . to transform the courts into personnel managers." *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507-08 (5th Cir. 1988).

As this Court has repeatedly reiterated in summary-judgment proceedings, "even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason" for termination. *Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 1002 n.8 (5th Cir. 2022); *Farmer v. Turn Key Installation, LLC*, 812 F. App'x 200, 203 (5th Cir. 2020) (per curiam); *Little*, 924 F.2d at 97. The same principle holds here: a belief, even if incorrect, that Harmon had exhausted her LWOP days constitutes a legitimate, non-discriminatory and non-retaliatory reason for her separation from TDCJ. *See Bryant*, 413 F.3d at 478 (stating that "evidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment decision").

Consequently, unless Reyes's alleged miscalculation of LWOP days was a pretext for disability discrimination and retaliation, any alleged error is insufficient to meet Harmon's burden of proving that her termination was unlawful. *Owens*, 33 F.4th at 826 ("Employers are 'entitled to be unreasonable' in terminating their employees 'so long as [they] do[ ] not act with discriminatory animus.'" (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)).

### 2. There is no evidence Harmon's separation was the result of discriminatory or retaliatory animus.

**a.** As mentioned, Reyes initiated Harmon's separation. ROA.3959-62. Yet Harmon produced no evidence indicating that Reyes intended to discriminate or retaliate against her by falsely claiming that Harmon had exhausted her LWOP.

Beginning with the disability-discrimination claim, Harmon failed to introduce evidence that, for example, (1) Reyes treated Harmon differently from a similarly situated employee without a disability, or (2) Reyes expressed any animus regarding Harmon's disabilities. Instead, the record shows that no one was given LWOP beyond the 180-day limit, ROA.2632, 2988, 3219, and Reyes, although not obligated to, called Harmon to warn her that she was about to exhaust her leave, ROA.3092-93. Harmon offers no reason why, in late May 2018 and after she had submitted dozens of requests for leave, Reyes suddenly decided that Harmon's disability warranted her separation from TDCJ. Indeed, Reyes understood that Harmon's doctor's note releasing her to work meant that she did not, in fact, have a disability. ROA.3105. Harmon has no evidence that Reyes's determination that she exhausted her 180 days of LWOP was a pretext for disability discrimination, much less that it was the sole cause for her separation from TDCJ. *See* 29 U.S.C. § 794(a).

With respect to Harmon's retaliation claim, the inquiry "requires a greater showing than mere causal connection. It requires that the plaintiff show that protected conduct was the reason for the adverse action." *Owens*, 33 F.4th at 835. Harmon did not do that here.

At the time of her separation, Harmon had engaged in two potentially protected activities. *First*, she filed an EEO grievance about her shift change, complaining that it was discriminatory. ROA.3920-47. Such actions are protected. 42 U.S.C. § 12203(a). But Harmon did not put forward any evidence that Reyes was even aware of the 2017 grievance at the time of her separation in May 2018. An employee cannot retaliate for something she did not know about. *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 n.6 (5th Cir. 2003). Regardless, the 7-month gap between when Harmon filed her EEO complaint in October 2017 and her separation in May 2018 is too long to demonstrate causality. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) (citing with approval cases holding that 3- and 4-month gaps are too long to demonstrate causality); *Goudeau v. Nat'l Oilwell Varco, LP*, 793 F.3d 470, 479 (5th Cir. 2015) (holding that an 8- to 10-month gap is too long to demonstrate causality).

*Second*, to the extent Harmon's repeated requests for LWOP constitute requests for reasonable accommodations, they would also be protected activity. 42 U.S.C. § 12203(b). But there is no evidence that, after processing Harmon's doctors' notes and leave requests for months, Reyes suddenly decided to retaliate against Harmon for submitting them. There is no evidence Reyes applied the LWOP policy differently to Harmon or expressed any animus regarding Harmon's requests for leave.

**b.** Siringi approved the payroll-status-change paperwork on June 8, ROA.3960, several days after Harmon's separation had occurred, ROA.3959, 3961-62. Consequently, he could not have caused her separation, regardless of his motivations. Even so, there is no evidence that (1) Siringi knew that Reyes's LWOP calculation could be wrong, or (2) Harmon had belatedly submitted a doctor's note

requesting leave. Instead, Siringi stated that he had nothing to do with calculating leave time, ROA.3229, and that he relied on the human resources personnel to handle it, ROA.3248-49. Further, he lacked the ability to extend LWOP beyond 180 days. ROA.3244-45. Moreover, Siringi approved Harmon's multiple requests for LWOP over the years. *See, e.g.*, ROA.4064-107 (multiple leave requests approved by Siringi); *see also* ROA.2641 (Harmon admitting she had never been denied LWOP in the past). There is no evidence that Siringi somehow managed to arrange Harmon's termination through her exhaustion of LWOP in order to discriminate or retaliate against her.

**c.** Finally, there is no evidence that anyone else involved in Harmon's separation held a discriminatory or retaliatory animus. The paperwork lists several other individuals—Brandi Doshier, Christi McClain, and Lydia Miller, ROA.3961-62—but there is no evidence that any of them intended to discriminate or retaliate against Harmon. And Werner was not involved in Harmon's separation at all and had no knowledge of the number of days Harmon had been out on leave. ROA.3036.

\* \* \*

Consequently, there is both a lack of substantial evidence and an absence of evidence to support the jury's verdict that Harmon's separation was caused by disability discrimination or retaliation. Instead, as Harmon testified, she would still be working for TDCJ had she not exhausted her LWOP. ROA.2643. The Court should reverse the district court's judgment regarding Harmon's termination.

## II. The Jury's Verdict That the Failure to Rehire Harmon Was Discriminatory and Retaliatory Is Not Supported by the Evidence.

Harmon's failure-to-rehire claim also suffers from a failure to prove discriminatory or retaliatory animus. ROA.408-12 (jury questions 1(b) and 4 relating to TDCJ and questions 1 and 4 relating to Collier). Harmon's failure-to-rehire claim depends on Werner's recommendation that she not be rehired. ROA.3435-36. But Werner was not the final decisionmaker regarding Harmon's rehire application. And there is no evidence demonstrating any animus by the final decisionmaker.

**A.** Werner testified that, after he reviews a rehire application, it is sent to the division director for the "final reviewer to sign off" on it. ROA.3030. This is confirmed by Harmon's application, which shows that Werner made a recommendation on January 13, but Billy Hirsch made the decision on January 25 that Harmon was "Not Approved for Rehire." ROA.3673. And there is no evidence regarding Hirsch's motivations for declining to rehire Harmon—indeed, there is no evidence about Hirsch at all.

The jury also had no grounds on which to conclude that Werner's recommendation was the reason for Hirsch's decision. *E.g.*, *Zamora v. City of Houston*, 798 F.3d 326, 332 (5th Cir. 2015) (discussing "cat's paw" analysis). To make such a showing, Harmon would have had to prove that (1) Werner possessed discriminatory or retaliatory animus, and (2) Werner "possessed leverage, or exerted influence," over Hirsch. *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004). Again, because there is no evidence regarding Hirsch, there is no evidence that Werner "possessed leverage" or "exerted influence" over him. The jury, therefore, had nothing

on which to base a verdict that TDCJ declined to rehire Harmon for discriminatory or retaliatory reasons.

**B.** Even if the jury believed Werner possessed leverage over Hirsch, there is insufficient evidence to conclude that Werner was motivated by improper animus in the first place. He testified that he did not recall why he declined to recommend Harmon for rehire. ROA.3013, 3032. And nothing in Harmon's rehire application would have notified him that she had a disability or had engaged in protected activity. ROA.3674-84.

The only other interaction reflected in the record between Harmon and Werner was his decision that she should be placed back on first shift after she filed a grievance and EEO complaint. ROA.3951. That alone suggests Werner held no discriminatory and retaliatory animus. Moreover, the over two-year gap between Harmon's EEO complaint and Werner's no-hire recommendation "suggests, by itself, no causality at all." *Clark Cnty. Sch. Dist*, 532 U.S. at 274.

There is also no evidence that Werner knew of Harmon's requests for LWOP or considered them requests for reasonable accommodations. And it does not appear that Werner was aware of Harmon's EEOC charge of discrimination at the time he made his no-hire recommendation. And even if he was, the gap of over a year between her charge and his no-hire recommendation is insufficient, standing alone, to prove causality. *Id.*

There is, thus, an absence of evidence from which the jury could conclude that the failure to rehire Harmon was due to discrimination or retaliation. The district

court erred in denying Defendants' motion for judgment as a matter of law and for new trial. This Court should reverse.

## III. The District Court Erred in Entering Judgment on Irreconcilable Jury Findings.

Even if the Court determines that sufficient evidence exists to uphold the jury's verdict, a new trial is still required because the jury's answers to the questions are irreconcilable. Harmon brought mutually exclusive claims. To succeed on her discrimination claims under the Rehabilitation Act, she had to prove that TDCJ's actions in terminating her employment and declining to rehire her were caused "*solely* by reason of her . . . disability.*" 29 U.S.C. § 794(a) (emphasis added); *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 504 (5th Cir. 2002). But to succeed on her retaliation claims under the same law, she had to prove that TDCJ would not have taken the actions it did (termination and failure to rehire) "but for" her protected activities. *January v. City of Huntsville*, 74 F.4th 646, 654 (5th Cir. 2023); *see also id.* at 652-53 (explaining that the Rehabilitation Act incorporates the standard found in the ADA). Retaliation cannot be a but-for cause of an adverse employment action that is solely caused by disability discrimination.

Yet that is what the jury found with respect to Harmon's termination and failure-to-rehire claims: both were caused *solely* by disability discrimination, but neither would have occurred *but-for* her protected activities. ROA.408-10. Those findings are irreconcilable, and the district court should not have entered judgment on them. *Moss v. Princip*, 913 F.3d 508, 521 (5th Cir. 2019). At a minimum, a new trial is warranted. *Id.*

**A.**  In this Court's most recent decision on irreconcilable jury answers, it discussed whether certain jury questions were (1) special verdicts, which do not require an objection prior to discharging the jury to preserve error, or (2) general verdicts, which do require an objection prior to discharging the jury to preserve error. *Team Contractors, LLC v. Waypoint Nola, LLC*, 976 F.3d 509, 514-15 (5th Cir. 2020); *see also* Fed. R. Civ. P. 49. In short, a special verdict involves a "special written finding on each issue of fact," Fed. R. Civ. P. 49(a), while a general verdict asks the jury to "apply the explanations given to them on the law to their fact findings and thereby indicate a final result." *Team Contractors*, 976 F.3d at 517.

The Court recognized, however, that it was bound by prior precedent that treated jury questions representing multiple general verdicts against a single defendant as special verdicts for purposes of preserving error. *Id.* at 518 (discussing *Mercer v. Long Mfg. N.C., Inc.*, 665 F.2d 61, 64 (5th Cir. 1982)). In *Mercer*, the case was submitted to the jury "in the form of a general charge with special verdict consisting of four interrogatories"—one for each cause of action against a single defendant, as well as a damages question. 665 F.2d at 64 & n.8. The Court treated this submission as a special verdict that did not require an objection prior to the discharge of the jury in order to preserve error. *Id.* at 65; *see also Mercer v. Long Mfg. N.C., Inc.*, 671 F.2d 946, 947 (5th Cir. 1982) (per curiam) (denial of rehearing). Thus, as this Court held in *Team Contractors*, *Mercer* controls in situations where, as in this case, "a verdict against one party on different claims is expressed . . . in a form similar to multiple general verdicts." *Team Contractors*, 976 F.3d at 518.

Here, then, regardless of whether the questions concerning TDCJ's liability for discrimination and retaliation under the Rehabilitation Act are considered special verdicts or multiple general verdicts, no objection was necessary prior to the discharge of the jury to preserve error. *Id.* Consequently, if the jury's answers are in irreconcilable conflict, the Court had no authority to enter judgment based on those answers. *Brunner v. Mar. Overseas Corp.*, 779 F.2d 296, 297 (5th Cir. 1986). A new trial must be held. *Id.*

**B.**  And the jury's answers here are in irreconcilable conflict. The test this Court applies when faced with possibly irreconcilable answers is to ask "whether the answers may fairly be said to represent a logical and probable decision on the actual relevant issues as submitted." *R.B. Co. v. Aetna Ins. Co.*, 299 F.2d 753, 760 (5th Cir. 1962). If "there is no view of the case which makes the jury's answers consistent and [] the inconsistency is such that the special verdict will support neither the judgment entered below nor any other judgment, then the judgment must be reversed and the cause remanded for trial anew." *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir. 1973).

Here, the jury found that TDCJ terminated and failed to rehire Harmon "solely because of her disability." ROA.408; *see also* ROA.410 ("solely" for having a record of or being regarded as having a disability). Although the jury instructions did not define "solely," the jury would have understood its common meaning: "to the exclusion of all else" or "without another." *Solely*, Merriam-Webster's Collegiate Dictionary (11th ed.). Sole cause means there can be no other cause.

Yet the jury then found that TDCJ would not have terminated Harmon and would have rehired her "but-for" her protected activities. ROA.409. But being a but-for cause means that retaliation was "the reason" TDCJ decided to act. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)). TDCJ's actions could not have been taken *solely* for the reason of disability discrimination but *also* for the reason of retaliation.

The jury's answer that Harmon's termination was solely caused by disability discrimination conflicts with its answer that it was also caused by her protected activities. The same holds for the jury's answers regarding her failure-to-rehire claim. The jury's answers are irreconcilable, and the district court should not have entered judgment on them. *Moss*, 913 F.3d at 521. Thus, regardless of what the Court concludes with respect to Defendants' other arguments, a new trial is warranted for this reason alone. *Id.*

## IV. The District Court's Damages Award Should Be Reversed.

The district court's judgment regarding damages was flawed in two significant ways. First, the district court's decision to award $1 million—the amount found by the jury—for "wages and benefits from May 31, 2018 to April 7, 2022" was unsupported by any evidence in the case. ROA.410. Harmon testified herself that her lost wages and benefits amounted to only $227,000. ROA.2595. Second, the district court's decision to hold Collier liable for damages and attorneys' fees was error. ROA.785-86. Harmon sought only reinstatement from Collier under the ADA. ROA.24-25.

Should the Court reverse any portion of the district court's judgment, it should also reverse both the backpay and attorneys' fees awards.

## A. There is no evidence that Harmon would have earned $1 million over four years.

There is no evidence to support the jury's award of $1 million in backpay—the amount of wages and benefits she would have earned in the four years between her termination and trial.

Question number 6 asked the jury:

> What sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiff Kimberly Harmon for the damages, if any, you have found Defendant Texas Department of Criminal Justice caused Plaintiff Kimberly Harmon?
>
> ***
>
> Wages and benefits from May 31, 2018 to April 7, 2022.

ROA.410. The jury answered "$1,000,000." ROA.410. But at the time of her termination, Harmon was making $3880 a month, ROA.2593, and she estimated that her lost wages and benefits at the time of trial amounted to $227,000, ROA.2595. That testimony does not support a verdict of $1 million.

Harmon has defended this amount based on her retirement benefits and the annuity she would have received had she stayed employed with TDCJ through 2029, ROA.2596-97, using ERS's projection of her retirement benefits. ROA.3566. Based on the ERS statement, Harmon testified she would have received $861,000 in annuity payments had she remained employed with TDCJ until she retired. ROA.2597. But as Harmon admitted, that amount is "a projection over the lifetime once I

retire." ROA.2884. In other words, any annuity payments would be received in the future—not between May 2018 and April 2022.

Pension benefits that an employee might receive in the future if they remain employed for another decade are not wages and benefits that an employee would have received in the past—here, the four years prior to trial. This Court has previously ordered that a judgment be altered to treat a pension enhancement as front pay, rather than backpay. *Miller v. Raytheon Co.*, 716 F.3d 138, 147 (5th Cir. 2013); *see also Skalka v. Fernald Envt'l Restoration Mgmt. Corp.*, 178 F.3d 414, 425 (6th Cir. 1999) (concluding that future pension benefits were front pay, not backpay). Moreover, Harmon included the $860,000 in future pension benefits as part of her request for front pay. ROA.587-88. Under her theory, then, TDCJ would be obligated for $1 million in backpay based on lost pension benefits, but also another $860,000 as front pay for the pension benefits she would have earned upon retirement. Harmon's allegedly lost pension benefits are not amounts she would have earned between May 2018 and April 2022 and cannot be used to support the jury's $1 million verdict. The award must be reduced to, at most, $227,000.

## B. Harmon cannot recover damages against Collier.

Harmon sued Collier for violations of the ADA. ROA.24-25. The ADA does not, however, waive the States' sovereign immunity for money damages. *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 360 (2001); *Sullivan v. Tex. A&M Univ. Sys.*, 986 F.3d 593, 596 (5th Cir.), *cert. denied*, 142 S. Ct. 216 (2021). But individuals can seek to enforce its provisions through prospective injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908). *Garrett*, 531 U.S. at 374 n.9. And that is what Harmon

sought to do when she sued Collier under the ADA and sought only prospective injunctive relief. ROA.24-25 (requesting "prospective injunctive relief . . . including an order of reinstatement to the position and benefits she would have held if she had not been terminated"). As counsel admitted during argument over the jury charge, Collier was "just a figurehead," and "we had to include him to get the injunctive relief we seek." ROA.3367. And in response to Defendants' motion to dismiss, Harmon asserted that she "is not seeking 'money damages or its equivalent' against Bryan Collier." ROA.274.

But the district court awarded monetary relief—not injunctive relief—against Collier, making him liable along with TDCJ for $1 million in damages. ROA.785-86. Such relief was not requested by Harmon, ROA.25, and was, in fact, expressly disclaimed by Harmon, ROA.274. It was not found by the jury, as the damages question referred only to TDCJ. ROA.410. And it is barred by immunity. *Sullivan*, 986 F.3d at 596. Neither Harmon nor the district court has explained why Collier should be liable for damages. That portion of the judgment must be revesed.

Should this Court reverse the judgment for damages against Collier, it must also reverse the attorneys' fees award against him. Because Harmon will have obtained no relief (monetary or injunctive) against Collier, she is not a prevailing party with respect to Collier and can obtain no attorneys' fees from him. 42 U.S.C. § 2000e-5(k) (permitting attorneys' fees to the "prevailing party"). The "touchstone of the prevailing party inquiry" is whether there has been a "material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Tex. State Tchrs. Ass'n v. Garland ISD*, 489 U.S. 782, 792-93 (1989); *see also*

*Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992). At a minimum, "[t]he plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought." *Farrar*, 506 U.S. at 111.

If the Court reverses the award of damages against Collier, Harmon will not have an enforceable judgment against him, nor will there have been a "material alteration" in their legal relationship. For that reason, Harmon will not have prevailed against Collier and is not entitled to attorneys' fees from him.

### C. The backpay and attorneys' fees awards should be reversed if this Court alters the judgment.

Because the damages and attorneys' fees awards could be impacted by the Court's decision on Defendants' liability, Defendants preserve their request that the monetary awards be reversed if Defendants' liability is altered.

**1.** Should Defendants prevail on the termination claim but not the failure-to-rehire claim, then the backpay award should be reversed, as the lost backpay would be measured from January 2020, when Harmon's application for rehire was denied, ROA.3673, through April 2022, the date of trial. The Court could render judgment based on the evidence in the record (an approximately 43% reduction based on months) or remand for the district court to recalculate Harmon's backpay.

**2.** To the extent the Court alters the judgment and reduces the grounds on which Harmon prevails (or eliminates them entirely), it should also reverse the award of attorneys' fees. The "most critical factor" in an attorneys' fee award "is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983); *see also Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 718 (5th Cir. 1974) (holding

that "[t]he amount involved and the results obtained" is a factor in attorneys' fees awards). Thus, if the extent to which Harmon prevailed is significantly diminished, the amount of attorneys' fees should be reduced as well.

## CONCLUSION

The Court should reverse the judgment of the district court and remand with instructions to enter judgment in favor of Defendants. Defendants request all other relief to which they are entitled.

Respectfully submitted.

ANGELA COLMENERO
Provisional Attorney General

LANORA C. PETTIT
Principal Deputy Solicitor General

BRENT WEBSTER
First Assistant Attorney General

/s/ Beth Klusmann

BETH KLUSMANN
Assistant Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Beth.Klusmann@oag.texas.gov

Counsel for Defendants-Appellants

## Certificate of Service

On August 30, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Beth Klusmann
Beth Klusmann

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,402 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Beth Klusmann
Beth Klusmann