No. 23-40342

# In the
# United States Court of Appeals
# for the Fifth Circuit

KIMBERLY HARMON,
*Plaintiff—Appellee*

v.

BRYAN COLLIER, EXECUTIVE DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE; TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
*Defendants—Appellants*

On Appeal from the United States District Court
for the Eastern District of Texas (Beaumont Division)
No. 1:20-cv-00460, Judge Michael J. Truncale

## BRIEF FOR APPELLEE

Clayton D. Craighead
400 Louisiana, Suite 900
Houston, TX 77002
(832) 798-1184 – Telephone
clayton.craighead@thetxlawfirm.com

Sara Richey
11777 Katy Freeway, Suite 335
Houston, TX 77079
(713) 636-9931 – Telephone
sara@therycheylawfirm.com

*Attorneys for Plaintiff—Appellee*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Local Rule 28.2.1, Appellee Kimberly Harmon certifies that the following persons, firms, and corporations are financially interested in the outcome of the litigation:

1.     Kimberly Harmon, Plaintiff—Appellee

2.     Bryan Collier—Appellant

3.     Texas Department of Criminal Justice—Appellant

4.     The Craighead Law Firm, PLLC, Counsel for Appellee

5.     Richey & Associates, Attorneys at Law, PLLC, Counsel for Appellee


*/s/ Clayton D. Craighead*
Clayton D. Craighead

## STATEMENT REGARDING ORAL ARGUMENT

In accordance with F.R.A.P. 34(a)(1) and 5th Cir. R. 28.2.3, Plaintiff—Appellee, Kimberly Harmon, submits that oral argument will not aid the Court's decisional process. However, if the Court is inclined to grant oral argument, Appellee respectfully requests that she be permitted to participate.

# I. TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................2

STATEMENT REGARDING ORAL ARGUMENT ............................................3

I.    TABLE OF CONTENTS.....................................................................4

II.   TABLE OF AUTHORITIES .............................................................5

III.  JURISDICTION.................................................................................1

IV. ISSUES PRESENTED ........................................................................1

V.   STATEMENT OF THE CASE ...........................................................2

VI. STANDARD OF REVIEW ................................................................9

VII. SUMMARY OF THE ARGUMENT...............................................10

VIII. ARGUMENT....................................................................................11

  A. Credibility ...................................................................................11

  B. The jury's verdict was supported by sufficient evidence that TDCJ
discriminated and retaliated against Harmon. ......................................12

    1)    Harmon was qualified for her position as correctional officer. ...............12

    2)    Evidence that decision to terminate Harmon was discriminatory or
retaliatory. ......................................................................................21

    3)    Reyes' calculation of LWOP .....................................................23

    4)    Evidence of discriminatory or retaliatory animus...................................25

    5)    Failure to rehire. .......................................................................28

  C. Irreconcilable Jury Findings .........................................................34

  D.   Damages ...................................................................................38

    1)    $1 million in backpay .................................................................38

    2)    Damages against Bryan Collier................................................41

    3)    Adjustments to backpay and attorney's fee awarded is not warranted....42

IX. CONCLUSION .................................................................................42

CERTIFICATION OF COMPLIANCE ........................................................43

CERTIFICATE OF SERVICE .....................................................................44

## II. TABLE OF AUTHORITIES

Cases

*Alaniz v. Zamora-Quezada*,
  591 F.3d 761 (5th Cir. 2009) ................................................................36

*Aldine Indep. Sch. Dist. v. Massey*,
  2018 Tex. App. LEXIS 4674 (June 26, 2018) .....................................21

*Barton v. Checkers Drive-In Re Staurants, Inc.*,
  No. 11-186, 2011 U.S. Dist. LEXIS 32251 (E.D. La. 2011) ........ 18, 20

*Boeing Co. v. Shipman*,
  411 F.2d 365 (5th Cir. 1969) ...............................................................10

*Brown v. Miss. Dep't of Health*,
  256 Fed. Appx. 710 (5th Cir. 2007) .....................................................38

*Bryant v. Compass Grp. USA, Inc.*,
  413 F.3d 471 (5th Cir. 2005) ...............................................................38

*Caldarera v. E. Airlines, Inc.*,
  705 F.2d 778 (5th Cir. 1983) ...............................................................38

*Carmona v. Sw. Airlines Co.*,
  604 F.3d 848 (5th Cir. 2010) ...............................................................14

*Carrillo v. Union Pac. R.R. Co.*,
  No. EP-21-CV-00026-FM, 2021 U.S. Dist. LEXIS 133087 (W.D. Tex. 2021) ..22

*Crossland v. Canteen Corp.*,
  711 F.2d 714 (5th Cir. 1983) ...............................................................35

*Delaval v. PTech Drilling Tubulars, LLC*,
  824 F.3d 476 (5th Cir. 2016) ...............................................................21

*Dufresne v. J.D. Fields & Co.*,
  CIVIL ACTION NO: 99-3714 SECTION: "D"(2),
  2001 U.S. Dist. LEXIS 17919 (E.D. La. 2001) ...................................39

*E.E.O.C. v. Dolgencorp, LLC*,
  899 F.3d 428 (6th Cir. 2018) ...............................................................22

*EEOC v. Chevron Phillips Chem. Co.*, LP,
  570 F.3d 606 (5th Cir. 2009) ...............................................................20

*EEOC v. Manville Sales Corp.*,
  27 F.3d 1089 (5th Cir. 1994) ...............................................................29

*Fagan v. U.S. Carpet Installation, Inc.*,
  770 F.Supp.2d 490 (E.D.N.Y. 2011) ...................................................36

*Federal Deposit Ins. Corp. v. Munn*,
  804 F.2d 860 (5th Cir. 1986) ...............................................................35

*Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*,
876 F.2d 1231 (5th Cir. 1989) ..............................................................38
*Foradori v. Harris*,
523 F.3d 477, 485 (5th Cir. 2008) ..........................................................9
*Gautreaux v. Scurlock Marine, Inc.*,
107 F.3d 331 (5th Cir. 1997) ................................................................10
*Giles v. General Elec. Co.*,
245 F.3d 474 (5th Cir. 2001) ................................................................38
*Griffin v. Matherne*,
471 F.2d 911 (5th Cir.1973). ........................................................ 34, 35
*Haas v. Advo Sys., Inc.*,
168 F.3d 732 (5th Cir. 1999) ........................................................ 28, 29
*Haire v. Bd. of Supervisors of La. State Univ.*,
719 F.3d 356 (5th Cir. 2013) ................................................................33
*Hensley v. Eckerhart*,
461 U.S. 424, 426, 103 S. Ct. 1933 (1983)……………………………… .42
*Jackson v. Host Int'l, Inc.*,
426 F. App'x 215 (5th Cir. 2011) ........................................................11
*Jones v. Okla. City Pub. Sch.*,
617 F.3d 1273 (10th Cir. 2010) ............................................................36
*Lane v. R. A. Sims, Jr., Inc.*,
241 F.3d 439, 444 (5th Cir. 2001) ..........................................................9
*Little v. Tech. Specialty Prods. LLC*,
No. 4:11-CV-717, 2013 U.S. Dist. LEXIS 152042 (E.D. Tex. 2013) ................36
*Long v. Eastfield College*,
88 F.3d 300 (5th Cir. 1996) ................................................................29
*Lowe v. Southmark Corp.*,
998 F.2d 335 (5th Cir. 1993) ................................................................40
*Miller v. Raytheon Co.*,
716 F.3d 138 (5th Cir. 2013). ..............................................................39
*Miss. Chem. Corp. v. Dresser-Rand Co.*,
287 F.3d 359 (5th Cir. 2002) ................................................................10
*Molina v. DSI Renal, Inc.*,
840 F. Supp. 2d 984 (W.D. Tex. 2011). ........................................ 18, 21
*Nat'l Hispanic Circus, Inc. v. Rex Trucking, Inc.*,
414 F.3d 546 (5th Cir. 2005). ..............................................................37
*Nelson v. Sisters of Charity of the Incarnate Word*,
967 F. Supp. 929 (S.D. Tex. 1997)........................................................42
*Pettway v. American Cast Iron Pipe Co.*,
494 F.2d 211 (5th Cir.1974) ................................................................40

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) ...................................11
*Rhines v. Salinas Constr. Technol., Ltd.*,
  574 Fed. Appx. 362 (5th Cir. 2014) ...................................................38
*Riel v. Elec. Data Sys. Corp.*,
  99 F.3d 678 (5th Cir. 1996) ...........................................................17
*Rodriguez v. ConAgra Grocery Prods. Co.*,
  436 F.3d 468 (5th Cir. 2006) .........................................................18
*Russell v. McKinney Hosp. Venture*,
  235 F.3d 219 (5th Cir. 2000) .........................................................32
*Seibert v. Jackson Cty.*,
  851 F.3d 430 (5th Cir. 2017) ..........................................................9
*Sharkey v. Lasmo (AUL Ltd.)*,
  214 F.3d 371 (2d Cir. 2000) ..........................................................39
*Sindhi v. Raina*,
  905 F.3d 327 (5th Cir. 2018) .........................................................41
*Taylor v. Bigelow Mgmt.*,
  No. 3-04-CV-1554-BD, 2006 U.S. Dist. LEXIS 112500 (N.D. Tex. 2006)........40
*United States ex rel. Wallace v. Flintco, Inc.*,
  143 F.3d 955 (5th Cir. 1998) .........................................................40
*Valenzuela v. Univ. of Tex.*,
  No. 1:19-CV-1202-RP, 2022 U.S. Dist. LEXIS 57970 (W.D. Tex. 2022)..........12
*Wallace v. Methodist Hosp. Sys.*,
  271 F.3d 212 (5th Cir. 2001).........................................................29
*White v. Grinfas*,
  809 F.2d 1157 (5th Cir.1987). .............................................. 34, 35, 37
*Whitehead v. Food Max of Miss., Inc.*,
  163 F.3d 265 (5th Cir. 1998) ..........................................................9
*Williams v. Monitowoc Cranes, L.L.C.*,
  898 F.3d 607 (5th Cir. 2018) .........................................................21

Statutes

28 U.S.C. § 1291 ..........................................................................1
28 U.S.C. § 1331 ..........................................................................1
29 U.S.C. § 794 ..........................................................................21
29 U.S.C. §§ 705(9)(B) ..................................................................12
42 U.S.C. § 12111(8) ....................................................................12
42 U.S.C. § 12112 ........................................................................22
42 U.S.C. § 2000e-5(k). ........................................................... 41, 42

<u>Other Authorities</u>

*Fowler V. Harper et al.,* 4 Harper, James and Gray on Torts
 § 20.2, at 100-101 (3d ed.2007) ...........................................................................35
W. Page Keeton et al., Prosser and Keeton on Torts
 § 41, at 264-66 (5th ed.1984). ............................................................................36

## III.  JURISDICTION

Defendants—Appellants Bryan Collier, Executive Director of Texas Department of Criminal Justice and Texas Department of Criminal Justice appeal from a denial of their motion for new trial in the United States District Court for the Eastern District of Texas—Beaumont Division.  The district court had federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

The district court entered its final judgment disposing of all claims on March 30, 2023. ROA.785-86.  Defendants—Appellants filed a motion for new trial and to alter or amend the judgment on April 27, 2023. ROA.793-830.  The district court denied Defendants—Appellants on May 17, 2023. ROA.2263. Defendants—Appellants filed a Notice of Appeal on June 2, 2023. ROA.2264-65. Pursuant to 28 U.S.C. § 1291, this Court has jurisdiction because the district court's final judgement disposed of all the parties' claims.

## IV.  ISSUES PRESENTED

1.  Whether taking leave from work means an employee is not qualified and cannot perform the essential functions of their job.

2.  Whether one more day of unpaid leave is a reasonable accommodation where the employer has a policy that allows for 180 days of unpaid time off.

3.      Whether an employer's misrepresentations to an employee, mistakes in designating and calculating that employee's leave, failures to follow its own policies, and witnesses that contradict each other regarding the employee's termination, can be evidence of discrimination and/or retaliation.

4.      Whether an employer can prevail where it failed to proffer any nondiscriminatory reason for not rehiring an employee.

5.      Whether a jury's findings that an employer discriminated and retaliated against an employee under the Rehabilitation Act are irreconcilable because of the causation standards.

## V.      STATEMENT OF THE CASE

Defendants appeal from a four-day trial in which the jury found against them on every basis of liability and awarded damages to Harmon accordingly. ROA.408-12. Likewise, the district judge that presided over the jury trial and saw the testimony and evidence, denied Defendants' post-trial motions to overturn the jury's resounding verdict. ROA.769, ROA.2263.

Harmon was a correctional officer for TDCJ for 19 years. ROA.2542:23-2543:6. On August 21, 2017, while out on medical leave, Harmon received a phone call from Amy Foreman in HR informing her that Warden Siringi had demoted her from first shift to second shift. ROA.2547:6-13. Foreman told Harmon that she

would be on second shift when she returned from medical leave. ROA.2547:14-17. During trial Defendants' witnesses initially attempted to deny that second shift was less desirable or a demotion from first shift but it quickly became apparent that was untrue. ROA.2942:11-2943:7, ROA.2944:19-22 (Werner first claiming the preference for first shift over second shift depends on the person and then admitting there is a waitlist for first shift) ROA.3211:17-19, ROA.3238:7-10 (Warden Siringi stating on direct the desirability of one shift over another depends on the person, then admitting on cross examination that there is a wait list for first and third shift, not second.). Regardless, it was a demotion to Harmon who had been on a waitlist for over three years to be placed on first shift. ROA.2546:13-25.

After she learned of the demotion, Harmon called the Warden several times and left messages for him, but he would not respond. ROA.2548:10-24. When he did not return her phone calls, Harmon sent him and Foreman a written interoffice communication. ROA.2548:25-2549:7. Harmon wanted to know why she had been moved to second shift and explained that first shift was easier for her because of the medications she had to take for her serious health conditions of diabetes and hypertension. ROA.3700, ROA.2550:11-16. Neither Warden Siringi nor Foreman responded. ROA.2550:21-24. So, Harmon called HR on September 1, 2017, and spoke with someone named Kelly about the situation. ROA.2551:1-12. Kelly informed Harmon that the system showed her back on first shift and Harmon thought

the situation was resolved. ROA.2551:8-24. But when Harmon returned to work on September 25 and reported to first shift, she found out that was not the case. ROA.2552:1-14. During morning briefing, Harmon's name was not called and she was asked to step outside. ROA.2552:1-10, ROA.2554:9-14. Harmon was told to go home because she had been assigned to second shift per HR's instruction. ROA.2554:20-22, ROA.2552:10-14. Even though Kelly in HR had told Harmon she was back on first shift and Harmon reported to work accordingly, TDCJ counted September 25 as an LWOP day against Harmon and she did not accrue vacation, sick, or holiday time for that month. ROA.3572-73 (September 2017 Employee Time Reporting System History Records missing for Harmon).

Harmon had to file four grievances, which included EEO complaints, regarding her shift demotion in order to get TDCJ to address the situation. ROA.3953-54, ROA.2556:18-2557:4, ROA.3783-3803. Eventually the Regional Director, Werner, investigated her EEO complaint. ROA.3951, ROA.2937:16-24. Her allegations were "Sustained. Relief granted". ROA.3954. Werner then ordered Warden Siringi to place Harmon back on first shift. ROA.2938:5-12, ROA.2939:17-20. In trial, Warden Siringi contradicted Werner and claimed that Werner left it up to him and that he decided to move Harmon back to first shift after all of the grievances she filed. ROA.3214:7-16, ROA.3235:8-12.

In mid-March 2018, TDCJ mailed a notice to Harmon informing her that she had eighty (80) days of LWOP remaining. ROA.3652. Harmon trusted TDCJ to provide her with accurate information and relied on this letter. ROA.2564:18-2565:9. Harmon did not receive any subsequent LWOP notices. ROA.2565:10-14. Then, on May 30, 2018, Human Resource Specialist Reyes left Harmon a voicemail at 4:36 p.m. telling her that she had run out of LWOP and she had to return to work the next day. ROA.2570:4-8. On May 31, 2018, before Harmon heard the message (her phone was broken so she did not hear it until the weekend (ROA.2568:6-16)) she went to her doctor who told her she needed one more day off. ROA.3874. Harmon's doctor's note requesting an additional day off was received by TDCJ that same day. ROA.3874. After she received Harmon's doctors' note, Reyes decided to submit the paperwork to terminate Harmon's employment and left Harmon a voicemail telling her not to come to work on Monday June 4. ROA.3101:17-3102:12, ROA.3104:2-6.

Instead of permitting Harmon one more day off—especially in light of two important facts: (1) Harmon had not yet exhausted her 180-days of LWOP, and (2) TDCJ had just represented to Harmon in March that she had eighty (80) days of LWOP remaining (and had only used a small subset of those days)—TDCJ terminated Harmon on June 8, 2018, for exhausting her LWOP, when it in fact was not exhausted. ROA.3959-3960. TDCJ did this without discussing Harmon's request

for just one additional day off, either internally or with Harmon, and despite TDCJ representing to Harmon just two months prior that she had eighty (80) LWOP days remaining. ROA.2985:1-21, ROA.3080:19-21, ROA.3101:4-3103:21. On the stand, TDCJ's Director of Employee Services, Shannon Wood, admitted that they had made errors and that they did not follow their own policies and procedures when terminating Harmon. ROA.3551:5-8.

At trial, Harmon disputed Defendants' claim that she had used 180 days of LWOP. Since Harmon worked at least 15 minutes on September 25 that day should not have counted as a day of LWOP according to Reyes and TDCJ's policy. ROA.3613, ROA.2912:18-23, ROA.3065:16-15, ROA.3070:15-19. Yet according to Defendants, Harmon used 30 days of LWOP in September 2017 even though they could not produce an "Employee Time Reporting System History Record" for that month. ROA.3569-3580 (missing September 2017 Record). Additionally, if an employee works at least eight or fifteen minutes on any day in a given month, they accrue that months' vacation and sick time. ROA.2962:13-20, ROA.2962:16-20, ROA.2963:20-2964:1. (Defendants' witnesses disagreed on whether is was eight or fifteen minutes.) But because they did not give her credit for September 25, she did not receive her vacation (13 hours/month) and sick time (8 hours/month) or holiday time (Labor Day) accrual for that month. ROA.2864:13-23. TDCJ's failure to account for September 25 properly meant Harmon had more than one additional day

of LWOP left when she was terminated. This is no surprise given that Wood, the Director of Employee Services, testified that Reyes, the person in charge of tracking LWOP and initiating separation due to exhaustion of LWOP, does not know what she is doing. ROA.3345:3-18, ROA.3348:14-17. Wood told the jury that everyone, except herself, that had testified for Defendants regarding Harmon's LWOP, including her boss, had provided incorrect numbers and calculations. ROA.3348:20-23. She also said all the other witnesses were wrong about which policy should have been followed for Harmon's termination, Policy 24 versus Policy 46. ROA.3348:24-3349:23 (Wood explaining Werner and Reyes both were wrong when they said Policy 24 applied Harmon's employment separation).

Harmon reapplied for her job as a correctional officer with TDCJ in November 2019, while her Charge of Discrimination against Defendants was being investigated by the EEOC. ROA.3678, ROA.2578:16-18. In order to process her application, TDCJ required Harmon to provide a doctor's statement certifying that she could perform the essential functions of a corrections officer. ROA.3684, ROA.2579:8-18. Yet even after Harmon provided the doctor's statement, Werner, the regional Director that had investigated her EEO complaint, recommended that she not be rehired. ROA.3674. On the stand, Werner could not articulate a non-discriminatory reason for why he recommended Harmon not be rehired. ROA.3012:24-3013:5.

Werner claimed that when he was evaluating Harmon's reapplication, he did not remember that she had filed the grievances alleging ADA discrimination or that he had investigated her EEO complaint. ROA.3040:15-19. He claimed he did not even remember that she had medical issues. ROA.3040:11-14. However, the first page of Harmon's application for rehire reviewed by Werner clearly stated that the reason for her previous termination was "Exhaustion of 180 days LWOP-Medical." ROA.3674, ROA.3040:25-3041:6.

Initially Werner tried to claim that perhaps re had not recommended Harmon for rehire because she had only checked that she was willing to work at the Gist unit on her application. ROA.3013:10-22. However, Werner was not aware that the jury had already heard a recording of a phone call in which Harmon is told by a TDCJ HR representative that it did not matter which unit(s) she marked on her application for the purpose of the hiring decision. ROA.2585:18-2587:17. And worse Werner admitted in his testimony later that the specific unit Harmon had marked on her application, was short correctional officers at the time Harmon applied for rehire. ROA.3043:1-6.

Harmon had 19 years of experience and only two write-ups during those 19 years, both for being tardy in 2010. ROA.3041:7-16. Werner admitted that Harmon was qualified and he had no questions about whether she could perform the job. ROA.3045:9-11. Werner ultimately had to concede that his reason for

recommending she not be rehired could not have been based on lack of experience, disciplinary issues, or her ability to perform the job. ROA.3044:19-3045:14. Additionally, Warden Siringi was consulted about Harmon's application for rehire and he testified that had it been up to him, he would have rehired her. ROA.3250:17-19. Werner even confessed he was "surprised" TDCJ had not reached out to Harmon since then given the huge shortage of correctional officers. ROA.3046:10-20

## VI.    STANDARD OF REVIEW

In the Fifth Circuit, the "review of the denial of a new trial motion is more limited than when one is granted." *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 269 (5th Cir. 1998). The denial will be affirmed unless there is "a clear showing of an absolute absence of evidence to support the jury's verdict, thus indicating that the trial court had abused its discretion in refusing to find the jury's verdict contrary to the great weight of the evidence." *Id.* (internal quotation marks, emphasis, and citations omitted); *Lane v. R. A. Sims, Jr., Inc.*, 241 F.3d 439, 444 (5th Cir. 2001) (same).

The Fifth Circuit "review[s] de novo the district court's denial of a motion for judgment as a matter of law, applying the same standard as the district court." *Foradori v. Harris*, 523 F.3d 477, 485 (5th Cir. 2008); *Seibert v. Jackson Cty.*, 851 F.3d 430, 434 (5th Cir. 2017) (same). The standard of review for sufficiency of the evidence is highly deferential to the jury's verdict. *See Boeing Co. v. Shipman*, 411

F.2d 365, 374 (5th Cir. 1969) (en banc) ("If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper."), *overruled on other grounds*, *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc); *Miss. Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 369 (5th Cir. 2002) (same).

## VII.   SUMMARY OF THE ARGUMENT

Harmon was a nineteen-year employee with TDCJ. She suffered disabilities, including diabetes, lower back pain, and hypertension. Everything was seemingly fine until August 2017, when Harmon was demoted from first to second shift while on medical leave. Harmon filed multiple grievances/EEO complaints about her demotion. Ultimately, her complaint was sustained and she was returned to first shift.

In March 2018, TDCJ represented to Harmon that she had eighty (80) days of her TDCJ-provided entitlement of 180-days LWOP leave. Then, on May 30, 2018 at 4:36p.m., TDCJ's employee, Marisol Reyes, left Harmon a voicemail stating that she needed to return to work the next morning. Harmon would not receive this voicemail until the weekend because her phone was broken. Prior to receiving this voicemail, Harmon was given a doctor's note explaining that she needed another day off.

Rather than engage in the interactive process with Harmon, TDCJ summarily terminated Harmon supposedly for exhaustion of her LWOP. No one considered Harmon's final doctor's note. And, in fact, the accommodations coordinator was never sent any of Harmon's 50 plus doctor's notes over the years or informed of their existence by Reyes because, according to Reyes, it was not her job to. ROA.3277:20-3278:15, ROA.3103:16-21, ROA.3104:10-15, ROA.3106:4-12, ROA.3104:25-3105:2.

Harmon later applied for rehire and was denied because Werner recommended she not be rehired. Nobody, including Werner, has articulated a single reason why Harmon was not rehired.

## VIII. ARGUMENT

### A. Credibility

The jury are the sole arbiters regarding credibility. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000); *see also Jackson v. Host Int'l, Inc.*, 426 F. App'x 215, 219 (5th Cir. 2011) ("At the end of the day, the jury was called to determine which story it believed—Jackson's or Host's. It chose Jackson's. The jury was free to credit or discredit his evidence, and we may not re-evaluate the jury's decisions regarding credibility."). This was a unique case because, based on the testimony and inconsistencies in

Defendants' witnesses' testimony, it is difficult to conceive the jury believing anything the Defendants' witnesses said.

## B. The jury's verdict was supported by sufficient evidence that TDCJ discriminated and retaliated against Harmon.

### 1) Harmon was qualified for her position as correctional officer.

Defendants argue Harmon was not a "qualified individual" under the Rehabilitation Act and Americans with Disabilities Act because Harmon could not perform the essential functions of her job. Whether someone is a "qualified individual" under the RA and the ADA is the same inquiry, because Section 504 of the RA incorporates the definition of "qualified individual" from the ADA. 29 U.S.C. §§ 705(9)(B), 20(B), 794(a); *see also Valenzuela v. Univ. of Tex.*, No. 1:19-CV-1202-RP, 2022 U.S. Dist. LEXIS 57970, at *18 (W.D. Tex. 2022) ("Section 504 of the Rehab Act adopts the ADA's definition of individual with a disability."). A "qualified individual" "means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Harmon testified unequivocally that she "performed all duties as a Correction Officer 5 and beyond" for the duration of her career. ROA.2874:21-23. Harmon went on to claim that she could perform her job "[j]ust as well as anybody else." ROA.2874:4-10. Werner also testified that Harmon did not have performance issues.

ROA.3045:5-8. Nor did Mr. Werner have any questions about whether Harmon could perform her job. ROA.3045:9-11. Likewise, Warden Siringi testified that Harmon could perform her job. ROA.3209:25-3210:2. He endorsed her rehire because she was a good corrections officer. ROA.3249:3-9. He characterized her as a "good employee." ROA.3249:14-16. He testified that if it were up to him, he "would have rehired her." ROA.3250:17-19.

The above testimony was supported by the documentary evidence. Harmon testified that she was returned to work "without restrictions", which is consistent with the documentary evidence. ROA.2562:6-17, ROA.3673. In Harmon's last doctor's note, the doctor fully released her to perform her job as a corrections officer. ROA.3874. Also, Vashunna Jefferson recommended Harmon for rehire, which would have been highly unusual if Defendants felt Harmon was incapable of performing her job duties. ROA.3673.

There is other evidence that provides factual support that Harmon was capable of performing her job. For example, in response to the EEOC, Defendants never alleged that Harmon was incapable of performing her job. Instead, Defendants took the position that Harmon's final doctor's note "would not have resulted in a change of status as the Charging Party's 180 days of leave without pay exhausted." ROA.3703. Defendants admitted that while they considered the Family & Medical

Leave Act ("FMLA"), they not once claimed to have considered the RA or ADA. ROA.3703.

Defendants argue that "attendance is an essential function" of the corrections officer position and that Harmon's absences precluded her from performing the essential functions of her jobs. But this is a misunderstanding of the law. In the Fifth Circuit, attendance *can be* an essential function of a job, but not in the circumstances presented in this case. Here, multiple evidentiary points supported the factual contention that attendance was not an essential function of Harmon's job. For example, Defendants maintained a very lenient work schedule, which is evidence that attendance was not an essential function of Harmon's job. *See Carmona v. Sw. Airlines Co.*, 604 F.3d 848, 859 (5th Cir. 2010) (employers lenient attendance policy established that attending work was not an essential function). In fact, the evidence demonstrated that Defendants' employees were "entitled" to 180-days leave as an absolute right to take when needed. ROA.1216:24-1217:11 (Harmon testifying 180-day LWOP was an entitlement), ROA.3328:15-17 (Wood testifying that 180-day LWOP was an entitlement). And Warden Siringi testified that he approved every single LWOP extension he had ever received. ROA.3243.

Defendants also kept a list of numerous employees who would backfill—on a voluntary basis—absent employees. ROA.2570:21-ROA.2571:14. Harmon herself was on this list so that she could backfill absent employees as well. ROA.2570:21-

ROA.2571:14. Additionally, nowhere in Harmon's job description is attendance listed as an essential job function. ROA.4046-4048.

As laid out in the definition of "qualified individual" under the ADA, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Nowhere in the job description is attendance identified as an "essential function" Consequently, there was sufficient evidence for the jury to conclude that Harmon was a qualified individual within the meaning of the RA and ADA.

### a. A request for leave with a defined return date is not a request for indefinite leave and is therefore reasonable.

Defendants claim that Harmon's need for an additional work day off was not a reasonable accommodation because a day, according to Defendants, equals indefinite leave. Defendants frame the facts in a manner that is misleading and inconsistent with the evidence. For example, Harmon did not request "indefinite leave". Rather, she requested one day of leave. ROA.2650:10-13, ROA.3874. The reason Harmon was requesting leave was because Defendants maintained a policy requiring employees to have zero restrictions. For example, Reyes testified that Defendants' policies prohibit employees from returning to work with *any* restrictions. ROA.2709:4-9. Warden Siringi was also asked, "before somebody

could return to work, they need to have a full 100 percent release from a doctor?" ROA.3241:17-20. Answer: "Yes. I'm aware of that." ROA.3241:17-20.

Further demonstrating that attendance was not an essential function was that Warden Siringi maintained a long list of employee names of people wanted to pick up additional hours. ROA.3247. And he utilized this list to cover absences, which makes sense if you require employees to be 100% released with zero restrictions in order to work. In fact, Warden Siringi testified that it was "common" for him to use the list to fill the positions of absent officers. ROA.3252:15-20.

Consequently, these pieces of evidence and others support the jury's finding that attendance was not an essential function of Harmon's job.

### b. Harmon's request for leave was reasonable

Defendants claim that Harmon requested over 180 days off. This is simply untrue. As addressed above, Harmon turned in a doctor's note on May 31, 2018, stating she would return to work June 4, 2018. From May 31 to June 4, there was only one workday for Harmon. ROA.2649:7-9. Consequently, Harmon's accommodation request was for a single day off work. ROA.2630 ("But the accommodation that I did need was the extension for the one day." ROA.2630 ("And I made the request for one day and -- yes.", ROA.2650 ("But the extension for the one day, they didn't do it.").)

As mentioned, the LWOP Harmon took was an "entitlement" that *every employee* received and, as addressed above, Warden Siringi not once denied giving LWOP. ROA.2651, ROA.3095:7-11, ROA.2650:24-2651:2. Moreover, Defendants did not plead the affirmative defense of undue burden or hardship and therefore are estopped from arguing that now on appeal. ROA.52-54; *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 682 (5th Cir. 1996) (recognizing undue burden and business necessity are affirmative defenses that must be asserted; otherwise, they are waived.)

Defendants claim employees would have been burdened had Defendants given Harmon a one-day extension to her leave, but Warden Siringi himself stated he had at the ready numerous correctional officers who were ready to work when the need arose. Not only were other correction officers ready, *but they were requesting the additional time*. Warden Siringi indicated allowing employees to take additional LWOP time over 180 days was allowed and within HR's purview. ROA.3218:16-22 (when employee's 180 days of LWOP "time expires, then it is up to HR to decide whether they're going to extend that leave or if they're going to get separated."). That was how Warden Siringi understood it. ROA.3218:18-25.

Additionally, Warden Siringi stated that it was common for him to have officers stay over to fill in for officers that were on leave. ROA.3252:15-18. Thus, it is hardly surprising the jury did not think it was unreasonable and expected them to do so for Harmon.

Finally, Defendants claim that Harmon's prior usage of the LWOP leave removed her from the "class protected by the ADA." But as addressed above, Harmon was capable of performing her job. The real issue was that Defendants maintained and enforced a "no restriction" policy whereby Defendants required Harmon to obtain a release that said she had zero restrictions, thereby forcing Harmon to take leave when in reality Defendants should have engaged in the interactive process. ROA.2562:6-17, ROA.2603:12-16 Such "no restriction" policies that predetermine the outcome of an accommodation request—like "100% healed" policies—are *per se* unlawful under the ADA and Rehabilitation Act. *See, e.g.*, *Barton v. Checkers Drive-In Re Staurants, Inc.*, No. 11-186, 2011 U.S. Dist. LEXIS 32251, at *8 n.19 (E.D. La. 2011) ("'100% healed' policies are per se violations of the ADA because the '100% healed' or 'fully healed' policy discriminates against qualified individuals with disabilities and permits employers to substitute a determination of whether a qualified individual is '100% healed' from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without accommodation."); *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 475 (5th Cir. 2006) (finding employer's blanket policy against hiring anyone perceived as having uncontrolled diabetes as contradictory to "the TCHRA/ADA's emphasis

on treating impaired job applicants as individuals"); *Molina v. DSI Renal, Inc.*, 840 F. Supp. 2d 984, 1003 n.174 (W.D. Tex. 2011).

Warden Siringi was asked why they would not extend LWOP for Harmon and his answer was: "I don't know." ROA.3219:19-20. This is the Warden of the Gist Unit offering no explanation for why they could not or would not give her another day off, especially after representing to her that she had 80 days off in March and given that she had not in fact used her 180-day entitlement of LWOP.

Defendants claim that "no witness was aware of any TDCJ employee who received additional LWOP beyond the 180 days specified in the TDCJ policy." But Warden Siringi testified that he approved every "LWOP extension" ever requested and would later contradict himself and claim he never gave such an extension. The jury was free to credit Siringi's agreement that he "always approved the LWOP extensions." ROA.3243:1-3.

### c. Harmon's request was reasonable.

Defendants claim that Harmon's failure-to-accommodate claim fails because the additional day off was an unreasonable request for accommodation. Defendants argue that they never provide leave beyond 180 days. But these types of bright-line rules (just like "100% healed" policies) sidestep the requirement that employers engage in the interactive process. For example, it cannot be there are no circumstances ever in time on Earth that would permit an employee of the TDCJ to

take a single day beyond the 180-day policy. Yet, that was the testimony of Defendants. ROA.3048:8-14 (Werner testifying that once 180-days leave exhausted "there's not going to be any consideration on the part of the TDCJ on whether to give any additional leave -- leave as an accommodation under the ADA"), ROA.2988:5-8 (Werner testifying the 180-day LWOP policy is never extended), ROA.2993:15-19 (Werner testifying that once 180-day LWOP exhausted, extending is "nonnegotiable"), ROA.3219:16-20 (Warden Siringi testified that he had never seen anyone receive an accommodation after the exhaustion of 180-day LWOP but "I don't know" why).) This is unlawful for the reasons 100% healed policies are unlawful.

Warden Siringi did admit, however, that if an employee is on FMLA leave, they may receive additional time once FMLA leave is exhausted but not disabled employees. ROA.3224:8-22 (employees on FMLA leave may receive extension, but not disabled employees).) This is also unlawful because it discriminates against disabled employees in favor of those who simply have a "serious health condition" under the FMLA.

Courts addressing these types of bright-line rules have repeatedly and consistently rejected them as unlawful under the ADA because they do not provide for the case-by-base fact-specific determination of whether an accommodation is

appropriate. *See, e.g., Barton*, No. 11-186, 2011 U.S. Dist. LEXIS 32251 at *8 n.19 (such policies are *per se* ADA violations).

And Harmon's doctor's note was a request for reasonable accommodation. *See, e.g.*, *EEOC v. Chevron Phillips Chem. Co.*, LP, 570 F.3d 606, 621 (5th Cir. 2009) (finding jury could reasonably find that doctor's note releasing employee to work constituted request for reasonable accommodation); *Molina v. DSI Renal, Inc*., 840 F. Supp. 2d 984, 1001 (W.D. Tex. 2011) (doctor's note constituted a request for accommodation). "[T]ime off from work, whether paid or unpaid, can be a reasonable accommodation." *Aldine Indep. Sch. Dist. v. Massey*, 2018 Tex. App. LEXIS 4674, at *10 (June 26, 2018) (citing *Delaval v. PTech Drilling Tubulars, LLC*, 824 F.3d 476, 481 (5th Cir. 2016).

## 2) Evidence that decision to terminate Harmon was discriminatory or retaliatory.

Defendants claim that "the jury's decision that she was separated because of disability or retaliation is not supported by substantial evidence." (Appellant's Brief, p. 27.) Defendants claim that "Harmon's evidence does not meet it." (*Id*.) But it is not Harmon who is required to produce "substantial evidence" to support the verdict; rather, it is Defendants who must present "substantial evidence" that does not support the verdict. *Williams v. Monitowoc Cranes, L.L.C.*, 898 F.3d 607, 614 (5th

Cir. 2018) ("cannot reverse a denial of a motion for judgment as a matter of law unless the jury's factual findings are not supported by substantial evidence").

Defendants claim "there is no evidence of motive here." (Appellant's Brief, p. 27.) But this is false for reasons discussed below. At the outset it is important to note that the RA and the ADA require discrimination "by reason of his or her disability" or "on the basis of disability." 29 U.S.C. § 794 ("by reason of her or his disability"); 42 U.S.C. § 12112 ("on the basis of disability"). This language is not without meaning. In a recent case in the Sixth Circuit, the employer claimed that an ADA plaintiff had to show animus. *E.E.O.C. v. Dolgencorp, LLC*, 899 F.3d 428, 436 (6th Cir. 2018). In rejecting that challenge to a verdict, Judge Sutton explained that:

> the Act speaks in terms of causation, not **animus**. An employer violates the Act whenever it discharges an employee 'on the basis of disability' (a necessary requirement for liability), not only when it harbors ill will (a sufficient way of establishing liability). Imagine a company that fired a visually impaired employee to save itself the minimal expense of buying special software for her. Without more, that would constitute termination 'on the basis of disability,' even if all of the evidence showed that cost-savings, not animus towards the blind, motivated the company.

(*Id.*)

To simplify: "[e]mployers cannot escape liability simply because discriminatory intent cannot be proved." *Carrillo v. Union Pac. R.R. Co.*, No. EP-21-CV-00026-FM, 2021 U.S. Dist. LEXIS 133087, at *8 (W.D. Tex. 2021). Consequently, it is not evident why Defendants believe there must be more. Nonetheless, there was evidence of motive. For example, there was evidence that:

1) Defendants relied on a bright line rule to refuse to engage in the interactive process with employees such as Harmon who requested a single day off as an accommodation;

2) Defendants gave preferential treatment to non-disabled employees;

3) Harmon's prior complaints about discrimination submitted to TDCJ were sustained;

4) Harmon was terminated within days of turning in her final doctor's note;

5) Defendants refused to rehire her without any explanation;

6) Werner claimed that termination date was the date of the last concurrence; but Reyes claims it is the date of the first concurrence. ROA.2698:24-2699:3. Separation was done on June 8, 2018, but Defendants implored the jury to believe it was really earlier. ROA.2700:4-7. Warden Siringi approved Harmon's termination on June 8, 2018. ROA.2697:11-13.

### 3) Reyes' calculation of LWOP

Defendants spend much of their time relitigating whether Reyes in fact made an error in her LWOP calculations. At trial, it was evident Reyes committed errors, intentional or not, in handling Harmon's leave and termination. Reyes even admitted she made mistakes. And Wood said Reyes did not know what she was doing and did not calculate Harmon's LWOP correctly. But the importance was not that errors occurred as much as Reyes' refusal to correct them or make any effort to even discuss them with anyone. For example, Reyes conceded that when she was "administratively terminating" Harmon, she had Harmon's final doctor's note, and nonetheless ignored it and terminated Harmon. ROA.2701:3-6. Reyes admitted that

she had the final doctor's note "for a full day before [she] initiated the separation process." ROA.2702:9-11.

Not only did Reyes admit she had possession of the doctor's note, but she did not forward it to anyone or tell anyone about it, because, according to her, "I'm not required to." ROA.2703:15-20. When asked about not sharing the doctor's note, she again said: "I'm not required to." ROA.2704:24-2705:1. But Warden Siringi testified that a request to go beyond LWOP should go to HR. ROA.3229:2-6. But not if Reyes had anything to do with it. Reyes' conduct was also against policy, which required her to "[c]ontact the Leaves Program Area via the HR_SEPARATE eform for review and concurrence *prior* to separating the employee for expiration of LWOP." ROA.3617 (emphasis added).

The inference, of course, was that TDCJ was motivated to terminate Harmon on the basis of her disability. But all this sidesteps a more fundamental issue in this case: Defendants made zero effort to engage in the interactive process as required by the RA and ADA. And then Defendants failed to provide reasonable accommodation that might have flowed from having that interactive process. Plus Defendants created this situation by repeatedly providing Harmon with wrong information. Kelly in HR told her she was back on first shift but when Harmon showed up for work on September 25 she was told to go home because she was on second shift and TDCJ docked her a day of LWOP and did not give her vacation and

sick time accruals for that month. Reyes sent Harmon a notice telling her she had 80 days of LWOP left on March 14, 2018 but then terminated her for running out of LWOP on May 30, 2018. And Reyes could not provide the System LWOP screen print that would show where she got the 80 days for the March notice, although she was required to print and maintain those records according to Defendant's policies. Defendants terminated a nineteen-year employee supposedly because she requested one additional day off. Simultaneously, Defendants admitted that (a) non-disabled employees who received FMLA leave are entitled to LWOP extensions but disabled employees are not; and (b) that Warden Siringi approved every "LWOP extension" he was ever asked for.

### 4) Evidence of discriminatory or retaliatory animus

A variety of individuals demonstrated animus through bizarre testimony that left a natural conclusion: Defendants were out to get Harmon. For example, Defendant's HR "accommodation coordinator", Terry Bailey, claimed that she could not discern that Harmon's final doctor's note was requesting a reasonable accommodation of one day off. ROA.3273:6-9 ("it doesn't tell me what the employee would be wanting."). Bailey doubled down, "I wouldn't know how to try to even start to accommodate the employee." ROA.3273:9-12. Yet when challenged with a nearly identical doctor's note that Harmon previously submitted, Bailey admitted she understood it to be requesting "September 1st off." ROA.3281:6-8,

ROA.3876, ROA.3281:6-14 (admitting the note was a request for an accommodation of one day off).) But later Bailey claimed to have no clue that Harmon's final doctor's note similarly requested time off work despite its identical language. ROA.3874. Then, Bailey, apparently realizing the inconsistency, changed her testimony to: "There is nothing there that says she needs an accommodation." ROA.3281:6-14. But Bailey would then contradict herself again and again in an apparent effort to attack Harmon. For example, she claimed these notes "ha[ve] no restrictions." ROA.3289:1-5. Then she admitted that notes indicated that "the restriction would be that she can't go to work for a day." ROA.3289:6-8. Of course the jury did not believe Bailey.

Defendants claimed they sent Harmon an "ADA packet", but the purported letter was not even addressed to Harmon and Defendants had no evidence it was ever sent. ROA.4053, ROA.3296:10-14 (Bailey could not explain why the letter was not addressed).) And Harmon denied receiving the letter. ROA.2622:15-ROA.2623:12. Conveniently for Bailey's story, Defendants failed to produce materials Bailey claimed to have kept that would reflect her sending the letter. ROA.3296:15-3297:3. Separately, Defendants submitted a version of letter to the EEOC, where it was not signed by Bailey. ROA.3865. But then offered a different version at trial that contained Bailey's signature with zero explanation for how that happened.

ROA.4053, ROA.3295:9-23 (admitting she did not know why there were two different versions of the letter).)

And the jury learned this because of the position statement submitted by Defendants to the EEOC and the other exhibits admitted by Defendants. The position statement raised other issues for Bailey. For example, in the position statement, Defendants claimed "it was not possible for the Agency to determine the specific accommodation(s) that were needed." ROA.3847. But Bailey testified that the nearly identical doctor's note was a request for accommodation of a day off work. ROA.3876, ROA.3281:6-14 (admitting the note was a request for an accommodation of one day off).)

Despite the feigned position that Defendants had no idea Harmon was requesting an accommodation, Defendants told the EEOC that "such an accommodation would not have been unreasonable, or unduly burdensome." ROA.3847 (apparently conceding that Defendants were aware she wanted one day off and that such an accommodation would not be unreasonable or unduly burdensome).) Bailey admitted that out of the approximately fifty (50) different doctor's notes submitted by Harmon to Reyes, Reyes did not share a single doctor's note with the Bailey or share their existence with her. ROA.3277:3-9.

And to the extent Defendants were confused or wanted more information, Bailey admitted Defendants could answer their supposed questions through the

interactive process. ROA.3298:17-22. But because Reyes did not "send any of these materials to [Bailey, the accommodations coordinator]", Bailey never had the chance to review the requests. ROA.3299:4-10.

When pressed, Shannon Woods refused to admit that Harmon should have received credit for a shift work when Harmon showed up for work on September 25, 2017—per HR's instruction—to only find out that HR told her the wrong shift. ROA.3354:9-3355:9. The inference was they were out to get Harmon.

### 5) Failure to rehire.

Defendants now claim, on appeal for the first time, that an undisclosed person named Billy Hirsch was the real decisionmaker in not rehiring Harmon. (Appellant's Brief, p. 33.) However, in their Motion for New Trial, Defendants pointed to someone named Mr. Lumpkin as the final reviewer and decision maker for Harmon's application. ROA.805. Regardless of whom the Defendants now name as the ultimate decision maker, in the Fifth Circuit, when addressing the same circumstances as here, where a subordinate recommended "no rehire" and the ultimate decisionmaker received that recommendation, "[i]t is more reasonable to infer that [the subordinate's] expressed concern over lack of 'chemistry' between the office and Haas was linked to Haas's age and that [the subordinate's] input indeed was influential in [the decisionmaker's] decision making." *Haas v. Advo Sys., Inc.*, 168 F.3d 732, 733 (5th Cir. 1999). This is especially so where the subordinate's

recommendation is not "vague and remote in time, but rather closely connected in subject matter and time to the employment decision." *Id.*

Here, Jefferson recommended rehire on December 18, 2019. ROA.3673. Werner recommended "no rehire" on January 13, 2020. ROA.3673. Less than two weeks later, Hirsch (according to the document in evidence) adopted Werner's recommendation on January 25, 2020. ROA.3673. This easily falls within the confines of *Haas* and is dispositive of Defendants' argument. *See Haas*, 168 F.3d at 733; *see also See Long v. Eastfield College*, 88 F.3d 300, 307 (5th Cir. 1996) ("The degree to which [the ultimate hiring officer]'s decisions were based on his own independent investigation is a question of fact which has yet to be resolved at the district court level. Viewing the evidence in the light most favorable to [plaintiffs], we must assume on appeal that [hiring officer] merely 'rubber stamped' the recommendations of [his subordinates].").

In another Fifth Circuit case, the Court wrote that a supervisor did not "participate" in a termination decision by merely investigating admitted misconduct because the plaintiff produced no evidence that she "recommended termination or otherwise participated in the decision making process." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 223 (5th Cir. 2001). But once the supervisor makes a recommendation as part of the decision process, the inference is that the decisionmaker relied upon that recommendation. *EEOC v. Manville Sales Corp.*, 27

F.3d 1089, 1094 (5th Cir. 1994) ("Although it is true that Morris did not formally make the final decision to discharge Mitte, the evidence makes clear that Morris recommended his discharge and that Bruntrager relied, to some degree, on that recommendation in making his decision.").

Defendants claim Harmon did not present evidence that Werner affected Hirsch's decision. But quite clearly, on the rehire form, Jefferson recommended rehire and Werner recommended no rehire, and then, less than two weeks later, Hirsch checks "Not Approved for Rehire". (3673.) And Defendants offered zero evidence of Hirsch's supposed involvement or offer anything to distance his decision from Werner's recommendation. These facts are sufficient under Fifth Circuit precedent for the jury to make the finding it did.

But more importantly, Defendants' argument sidesteps other glaring issues. First, there was zero evidence that Hirsch did not rely on Werner's recommendation. Second, it was entirely reasonable for the jury to infer that Hirsch requested Werner's opinion precisely because Hirsch wanted to rely on Werner's opinion. Third, not a single witness ever explained *why* Harmon was not rehired despite Siringi unequivocally testifying that if it were up to him, he would have rehired Harmon, and Werner admitting that there was a shortage of correction officers in general and at the Gist unit specifically. ROA.3034:1-4 (Werner explaining "we're in the realm of 8,000 correctional officers short"), ROA.3043:1-4 (Werner admitting

"yes, sir, we would have had shortages" in the Gist unit at the time), ROA.3250:17-19 (Siringi admitting "if that were up to you, you would have rehired her."), ROA.3250:3-9 (Siringi admitting he recommended Harmon be rehired).)

Defendants claim that "even if the jury believed Werner possessed leverage over Hirsch, there is insufficient evidence to conclude that Werner was motivated by improper animus." (Appellant's Brief, p. 34.) This is because—according to Defendants—Werner testified "he did not recall why he declined to recommend Harmon for rehire." (Appellant's Brief, p. 34.) But Werner's claim that he had no recollection of why he recommended no rehire—after everyone else who participated admitted recommending Harmon for rehire—is simply not credible. Defendants claim that "nothing in Harmons' rehire application would have notified him" that Harmon had medical issues. (Appellant's Brief, p. 34.) But in the second page of the rehire packet, it quite clearly stated that Harmon was terminated for "Exhaustion of 180 days LWOP-Medical." ROA.3674. Werner also had knowledge because of his participation in Harmon's EEO complaint.

Werner was asked if he was responsible for responding to Harmon's EEO complaint wherein she alleged disability discrimination. Answer: "Correct." ROA.3040:20-24. He was asked if the rehire application "indicate[d] that the reason for her termination was LWOP medical." Answer: "Correct". ROA.3040:25-3041:3. Werner then admitted that the reference to LWOP medical would indicate prior

medical issues with her employment. ROA.3041:4-6. Werner admitted that the failure to rehire had nothing to do with performance issues ROA.3045:5-8, or her ability to perform the job ROA.3045:9-11, and nothing to do with "little tardies from 2010" ROA.3045:12-14.

But Werner also doomed the Defendants' credibility, much like their other witnesses. For example, he was asked if Harmon's EEO grievance was referred to him; his response: "No, sir." ROA.2926:18-22. But in Defendants' second position statement to the EEOC, Defendants wrote that Defendants "referr[ed] the matter to Warden Siringi's manager, Region III's Direction, John Werner for investigation." ROA.3846-3847. Then when confronted with the inconsistency, he back pedaled and admitted it was referred to him but claimed "there was no EEO allegations in it." ROA.2933:24-2934:7. Well the author of Defendants EEOC position statement clearly disagreed with him and the jury likely concluded he was being less than honest.

Most importantly, Defendants offered zero evidence as to why Harmon was not rehired. Of course, it was Defendants' burden to proffer a legitimate, nondiscriminatory reason for Defendants' refusal to rehire Harmon. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000) ("the employer must respond with a legitimate, nondiscriminatory reason for its decision"). Absent such a showing, there's a "mandatory inference of discrimination" created by the

plaintiff's *prima facie* case. *Id*. Indeed, in the jury instructions themselves, Defendants laid out their contentions for why they terminated Harmon but offered no explanation for why they refused to rehire Harmon. ROA.395-401.

This, along with all the other evidence, was sufficient for the jury to conclude Werner was aware of Harmon's prior and pending EEOC complaint when he made the decision not to rehire her. Especially given that no one, including Werner, could explain to the jury why she was not rehired. But bear in mind—the shortage of 8,000 corrections officers continues—and Werner testified that he was "surprised" that Defendants still have not sought to rehire Harmon given her ample qualifications and strong performance in the job. ROA.3046:10-20.

Defendants claim that there was insufficient temporal proximity between Werner's decision to not rehire Harmon and Harmon's filing of the charge of discrimination. (Appellant's Brief, p. 34.) But everyday Harmon's charge of discrimination was pending with the EEOC she was participating in an investigation, which constituted protected activity. *Haire v. Bd. of Supervisors of La. State Univ.*, 719 F.3d 356, 367 (5th Cir. 2013) (participation in EEOC process constituted protected activity). Harmon filed her charge with the EEOC in July 2018. ROA.2588:4-9. Harmon applied for rehire on November 6, 2019. ROA.2577:16-18. Werner's recommendation to not rehire Harmon was made on January 13, 2020. ROA.3673. TDCJ sent its second position statement to the EEOC on February 10,

2020, just days after deciding not to rehire Harmon despite her years of experience and qualifications. ROA.3846. Consequently, the "temporal proximity" was zero days given that the EEOC investigation was ongoing and such close temporal proximity is legally sufficient alone to establish causation. *See Haire*, at 367.

### C. Irreconcilable Jury Findings

Defendants claim "Harmon brought mutually exclusive claims" because "[r]etaliation cannot be a but-for cause of an adverse employment action that is solely caused by disability discrimination." (Appellant's Brief, p. 35.) But this is based on a misunderstanding of the jury verdict and the law. Defendants claim that the jury verdict is therefore inconsistent.

As an initial matter, the jury verdict is not inconsistent. But even if somehow were, it still is reconcilable. "If the jury's answers appear to conflict, we must attempt to reconcile the answers to validate the jury's verdict." *See White v. Grinfas*, 809 F.2d 1157, 1161 (5th Cir.1987). In reconciling supposed conflicts, courts must determine whether "the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted." *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir.1973).

Here, every question submitted to the jury had the same factual and legal nexus: Harmon's disability. The jury found Harmon was terminated "solely because of her disability"; not rehired "solely because of her disability"; would not have been

terminated "but for" her "requesting accommodations"; would not have been terminated "but for" her "complaints related to her disability"; not reasonably accommodated; not rehired "but for" her filing a charge of discrimination; not rehired "but for" her requesting accommodations; not rehired "but for" her filing complaints related to her disability; and terminated her "solely because of her having a record of" disability. If Defendants' argument were accepted, any litigant who prevailed on both a discrimination claim and a retaliation claim under the Rehabilitation Act would ultimately lose, because as Defendants argue: if an employee's termination is at all retaliatory, then the disability could never be sole cause for discrimination and vice versa.

Under Fifth Circuit precedent, when the jury's answers appear to conflict, courts are obligated to reconcile the answers, if possible, to validate the jury's verdict. *See, e.g., Federal Deposit Ins. Corp. v. Munn*, 804 F.2d 860, 867 (5th Cir. 1986); *Crossland v. Canteen Corp.*, 711 F.2d 714, 725 (5th Cir. 1983). Indeed, this effort is required by the Seventh Amendment. *See, e.g., Crossland*, 711 F.2d at 725. The touchstone in reconciling apparent conflict is whether "the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted." *Griffin,* 471 F.2d at 915.

Here, the "effort to reconcile the jury's answers to affirm its verdict presents far less than a Herculean task." *White*, 809 F.2d at 1161. As addressed, all the

questions focused on Harmon's disability and the attendant misconduct. Moreover, Defendants' argument misunderstands "sole cause" and "but for". Indeed, Defendants argue that "but for" is really a "sole cause" standard, but it is not.

A plaintiff's injury can have multiple "but-for" causes, each one of which may be sufficient to support liability. *See Fowler V. Harper et al.,* 4 Harper, James and Gray on Torts § 20.2, at 100-101 (3d ed.2007) ("Probably it cannot be said of any event that it has a single causal antecedent ....") (collecting cases); W. Page Keeton et al., Prosser and Keeton on Torts § 41, at 264-66 (5th ed.1984). Requiring proof that a prohibited consideration was a "but-for" cause of an adverse action does not equate to a burden to show that such consideration was the "sole" cause. *See, e.g., Fagan v. U.S. Carpet Installation, Inc.,* 770 F.Supp.2d 490, 496 (E.D.N.Y. 2011) (explaining that under the Age Discrimination in Employment Act "[t]he condition that a plaintiff's age must be the `but for' cause of the adverse employment action is not equivalent to a requirement that age was the employer's *only* consideration, but rather that the adverse employment actions would not have occurred without it.") (citation omitted).

The Fifth Circuit has held that but-for causation does not require sole causation. *See Alaniz v. Zamora-Quezada*, 591 F.3d 761, 777 (5th Cir. 2009) (holding in Title VII retaliation case that "but-for" cause is simply not synonymous with "sole cause"); *see also Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1277-78

(10th Cir. 2010) (holding in ADEA case after *Gross* that "but-for" does not require sole causation); *Little v. Tech. Specialty Prods. LLC*, No. 4:11-CV-717, 2013 U.S. Dist. LEXIS 152042, at \*18 (E.D. Tex. 2013) ("but-for" cause does not equal "sole cause"). Here, Defendants could have terminated Harmon solely based on disability and separately could have retaliated "but for" Harmon engaging in protected activity because, but for Harmon's disability, she never would have engaged in protected activity.

Importantly, even if the jury verdict was inconsistent as Defendants claim, their argument fares no better under Fifth Circuit caselaw because, if the jury's answer to a question should have pretermitted further inquiry is clear and disposes of the legal issues, court's "must ignore the jury's conflicting answers to any other questions, as they are irrelevant." *Nat'l Hispanic Circus, Inc. v. Rex Trucking, Inc.*, 414 F.3d 546, 551 (5th Cir. 2005). As discussed in *White*, 809 F.2d at 1161:

> To effectuate best the intent of the jury, we hold that if the district court has correctly found that the jury's answer to a question that was supposed to terminate further inquiry is clear and disposes of the legal issues, on review we must ignore the jury's necessarily conflicting answers to any other questions. The subsequent questions are by definition irrelevant in these circumstances, and cannot be used to impeach the jury's clear verdict.

Here, the jury could have stopped deliberating after answering the first question and completing the damages interrogatories. Consequently, because the

first question could have disposed of all legal issues except for damages, the jury verdict is reconcilable. *See, id*.

### D. Damages

#### 1) $1 million in backpay

Under Fifth Circuit law, there is a "strong presumption in favor of affirming a jury award of damages." *Giles v. General Elec. Co.*, 245 F.3d 474, 488 (5th Cir. 2001). The jury's award "is not to be disturbed unless it is entirely disproportionate to the injury sustained." *Rhines v. Salinas Constr. Technol., Ltd*., 574 Fed. Appx. 362, 368 (5th Cir. 2014) (unpublished) (quoting *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr*., 876 F.2d 1231, 1236 (5th Cir. 1989)); *see also Caldarera v. E. Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983). The jury's verdict is afforded great deference such that the court must refrain from substituting its opinion in place of the jury's. *Brown v. Miss. Dep't of Health*, 256 Fed. Appx. 710, 711 (5th Cir. 2007) (unpublished) (quoting *Bryant v. Compass Grp. USA, Inc*., 413 F.3d 471, 475 (5th Cir. 2005)). Only if the court is "left with the perception that the verdict is clearly excessive" should deference to the jury be abandoned. *Giles*, 245 F.3d at 488. Here the jury was asked the following question:

> What sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiff Kimberly Harmon for the damages, if any, you have found Texas Department of Criminal Justice cause Plaintiff Kimberly Harmon?

410 (the jury answered: "$1,000,000").

The question did not just ask the jury to calculate Harmon's "back pay" as Defendant claims in its motion. As the law allows, the jury was asked to determine the present cash value of the "wages and benefits" that would fairly compensate Harmon. In addition to her wages, Harmon's benefits included health insurance, a vested 401(k) with employer matching, a state pension, life insurance, and disability retirement benefits. In calculating Harmon's damages, the jury could have relied upon Harmon's testimony, the unfinished damages calculation chart created by Defendant for trial ROA.3963, Harmon's 2016 Statement of Retirement Benefits ROA.3563-3568, or the fact that Defendant failed to produce or supposedly even create a such a statement for Harmon for 2017 and 2018. Harmon testified that after Defendant terminated her employment, she suffered financial hardships that forced her to withdraw her retirement contributions. ROA.2575:19-2576:6.

Defendant argues that the jury clearly must have calculated the ERS Statement as a part of Harmon's backpay. But the Fifth Circuit has not adopted an inflexible rule on the treatment of "pension benefits" as damages. *Miller v. Raytheon Co.*, 716 F.3d 138, 147 n.3 (5th Cir. 2013). In some cases, it refers to employer contributions to a 401(k) plan; in others, to the right to receive certain benefits in the future; in others, the accrual of seniority entitlements to enhanced payments. *Compare e.g., Sharkey v. Lasmo (AUL Ltd.)*, 214 F.3d 371, 374-75 (2d Cir. 2000) ("pension

credits" in form of "service and salary credits" coextensive with back pay award should be treated as back pay). Lost 401(k) benefits can be a part of back pay damages, *Dufresne v. J.D. Fields & Co*., CIVIL ACTION NO: 99-3714 SECTION: "D"(2), 2001 U.S. Dist. LEXIS 17919, at *12 (E.D. La. 2001) (Plaintiff is entitled to a total of $ 20,330 in back-pay = $ 7,540 (lost earnings for 1999) + $ 11,420 (lost earnings for 2000) + $ 300 (lost earnings for 2001) + $ 1,070 (lost 401K benefits).

More importantly, like all damages, the amount of back pay need not be proven with mathematical precision. "All that the law requires is that the best evidence of which a case is susceptible be produced, and if from such evidence the amount of damages caused by the defendant can be inferred or estimated by the jury with reasonable certainty, then the amount of such damages is for the jury." *United States ex rel. Wallace v. Flintco, Inc.*, 143 F.3d 955, 965 (5th Cir. 1998). *Taylor v. Bigelow Mgmt.*, No. 3-04-CV-1554-BD, 2006 U.S. Dist. LEXIS 112500, at *5 (N.D. Tex. 2006). A jury's calculation of back pay should be reasonable and supported by evidence, but it is not necessary that the amount be exact or certain. *See Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 260 (5th Cir.1974), *cert. denied,* 439 U.S. 1115, 99 S. Ct. 1020, 59 L. Ed. 2d 74 (1976) ("Unrealistic exactitude is not required."). And when reviewing the measure of damages, all uncertainties should be resolved against the discriminating employer. *Id.* at 260-61; *Lowe v. Southmark Corp.*, 998 F.2d 335, 337 (5th Cir. 1993).

Here, the jury deliberated for almost two hours and were unanimous in their verdict. Neither a new trial nor remittitur is appropriate here. The court should give deference to the jury's decision.

### 2) Damages against Bryan Collier

Defendants claim—for the first time—that the judgment entered was erroneous with respect to Bryan Collier. Specifically, Defendants claim Collier cannot be subjected to such damages because he enjoys sovereign immunity under the ADA. This objection was waived by Defendants failure to raise it with the trial court after the final judgment issued. *Sindhi v. Raina*, 905 F.3d 327, 333 (5th Cir. 2018) ("arguments not raised before the district court are waived and cannot be raised for the first time on appeal.").

Defendants claim that if the money damages against Collier are vacated, then so too should the award of attorneys' fees against Collier. Defendants claim Harmon is not a "prevailing party". But this is a misunderstanding of the law. Title VII provides that a court may, in its discretion, award the "prevailing party" in any action under that subchapter "a reasonable attorney's fee." 42 U.S.C. § 2000e-5(k).

Section 2000e-5(k) states:

> In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

A plaintiff may be considered a "prevailing party" for attorneys' fees purposes if he or she succeeds on any significant issue in litigation that achieves some of the benefit the party sought in filing suit. *Hensley v. Eckerhart*, 461 U.S. 424, 426, 103 S. Ct. 1933, 1935 (1983); *see also Nelson v. Sisters of Charity of the Incarnate Word*, 967 F. Supp. 929, 931 (S.D. Tex. 1997).

Here, Harmon sought money damages and to clear her good name. She accomplished both and was therefore properly considered a "prevailing party" under Section 2000e-5(k).

### 3) Adjustments to backpay and attorney's fee awarded is not warranted.

For the reasons stated above, there should be no adjustment to Harmon's backpay or attorneys' fees. For example, even if this Court were to lower Harmon's damages, such a lowering has no bearing on the resounding success Harmon had against Defendants.

## IX. CONCLUSION

For the foregoing reasons, the District Court's Final Judgment should be affirmed.

October 30, 2023

Respectfully submitted,

*/s/ Clayton D. Craighead*
Clayton D. Craighead

State Bar No. 24065092
400 Louisiana, Suite 900
Houston, TX 77002
(832) 798-1184 – Telephone
clayton.craighead@thetxlawfirm.com

Sara Richey
11777 Katy Freeway, Suite 335
Houston, TX 77079
(713) 636-9931 – Telephone
sara@thericheylawfirm.com

*Counsel for Plaintiff—Appellee*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), Appellee certifies that the foregoing brief is compliant because it contains a total of 11,013 words, inclusive of sections that are exempted by Rule 32(f). The word processing software used to determine the total word count of this brief is Microsoft Word.

Pursuant to Federal Rule of Appellate Procedure 32(a)(5)(A), Appellee states that the foregoing brief is compliant because it has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

Pursuant to Fifth Circuit Local Rule 25.2.13, Appellee certifies that any required privacy redactions have been made and the document has been scanned for viruses with the most recent version of Adobe Acrobat.

*/s/ Clayton D. Craighead*
Clayton D. Craighead

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this 30th day of October 2023, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send electronic notice to counsel of record for Defendants—Appellants Bryan Collier, Executive Director of Texas Department of Criminal Justice and Texas Department of Criminal Justice.

*/s/ Clayton D. Craighead*
Clayton D. Craighead